[Crim. No. 8936. First Dist., Div. One. Aug. 23, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
MONROE HAYES, Defendant and Appellant.

460

COUNSEL

Dorothy P. Young, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci and Eugene Kaster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOLINARI, P. J.** — Defendant appeals from a judgment of the court entered on a jury verdict finding him guilty of two counts of assault with a deadly weapon in violation of Penal Code section 245. He contends that the evidence is insufficient to support the judgment of conviction; that he was denied a fair trial because the waiver of his *Miranda* rights was obtained while he was intoxicated; that the district attorney was guilty of prejudicial misconduct; that his trial counsel was incompetent; and that the punishment imposed by the court was excessive. We have concluded that none of the contentions are meritorious.

### *The Facts*

On the evening of November 21, 1969, Michael Miller, a longshoreman, was conversing with defendant at Mike's Club in Eureka. Miller and defendant talked about something that had happened previously between

defendant and another longshoreman. Defendant asked Miller if he "wanted to fight about it," and the two stood up. Miller saw a knife in defendant's right hand. Defendant began swinging the knife and, when Miller attempted to block a blow, his arm was slashed.

Mrs. Shirley Davis, who was sitting at the bar near defendant, saw a closed knife in defendant's hand. Defendant told her, "There is going to be trouble." She moved to the other end of the bar and told the bartender, who then approached Miller and defendant and attempted to quiet them. The bartender then walked back to the other end of the bar and telephoned the police.

Paul Bressman, another longshoreman, looked up from his pool game and saw defendant swing at Miller. He walked over and told defendant to "lay off the kid." Defendant took a swing at Bressman. Bressman threw up his arm to block defendant's swing and was cut, although he did not immediately realize that he had been wounded. As defendant was attacking Bressman, Miller heard defendant say to Bressman, "I am going to kill you." Bressman backed away from defendant and the altercation moved all the way to the other end of the bar. Although Bressman was cut several times on the abdomen, he did not see a knife in defendant's possession. Bressman testified that he never swung at defendant.

After Miller backed away from defendant, he walked over to Pat O'Shea, a local salesman, and told him "I have been cut on the hand." O'Shea saw defendant swinging the knife back and forth and cutting Bressman.

James January, a laborer who had been shooting pool with Bressman, saw the knife in defendant's hand when Bressman told defendant to "lay off" Miller. He saw defendant hit Bressman two or three times with the knife. He did not see Bressman take any swings at defendant. Finally, January was able to grab defendant and wrestled him to the floor.

Robert Stierna, a longshoreman, attempted to keep Miller and defendant apart. He saw defendant reach in his pocket and slide something down beside his hip. Defendant appeared to be opening a knife. Defendant's hand began to move in a circular fashion and Stierna backed up. When January knocked defendant to the floor, Stierna pried a black-handled knife from defendant's right hand. The blade of the knife was broken.

Police officers were dispatched to Mike's Club. Officer Ernest Rasmussen met Stierna in front of the club where Stierna gave him a knife. Rasmussen examined Miller's cut. When he observed Bressman he asked the bartender to call an ambulance, and then told him, "Never mind, I can do it quicker by radio." Defendant was placed under arrest by Officer Charles

Taylor who asked Officer Thurman Fogarty to advise defendant of his rights. Fogarty went over to the patrol car where defendant was screaming, "Let me out of here, I'll kill the son-of-a-bitch." Fogarty finally quieted him down and then read the *Miranda* warning to him.

While sitting in the patrol car, defendant yelled at Police Sergeant Gordon Busey, "Busey, hey, Busey, come here." Busey walked to the patrol car and defendant pointed to Miller and said, "Let me out of here, I'll kill that guy." A woman approached the car, and defendant said, "Did you see me give it to him? It took six of them."

January, who helped to clean up the blood on the barroom floor, found the piece of blade that had been broken from defendant's knife.

Doctor Theodore A. Poska, who examined Miller and Bressman, described Miller's cut as an inside wound on the left wrist approximately three inches in length and one-half inch in depth. Bressman had a similar injury of the wrist, a four- or five-inch wound in the left side of the neck and two cuts across the abdomen which were approximately 12 inches long and formed an "X." The abdominal wounds required about 20 sutures. The wounds appeared to have been made by a sharp instrument.

Defendant's girl friend testified that the argument between Miller and defendant began when Miller walked up to defendant and told defendant he couldn't "talk to James January like that." Then Bressman came over, laid his glasses on the bar, and the altercation started. She did not see defendant swing at Miller; nor did she see defendant with a knife. She also testified that she did not see any cuts on Miller or Bressman and did not see any blood.

January's girl friend testified that she was talking on the telephone when the altercation started. She saw Bressman and defendant scuffling and saw a couple of other people attempting to separate them. She did not see the knife but saw a blade afterward when she helped clean the floor.

Defendant testified that he had been talking with January about some money when Miller told him, "You can't talk to James [January] that way." Defendant said, "I talk to James any way that I want to, he's a brother of mine." Then Bressman came over and said, "Lay off the kid." Defendant said, "I am not bothering him." Bressman then took his suit coat and glasses off and said, "You ready?" Defendant said he was, and they began fighting. While they were grappling, January grabbed defendant around the neck. Defendant never saw a knife. He did admit calling Busey to the patrol car and saying, "I want to get out and finish this off right here."

## Sufficiency of the Evidence

■ Defendant's attack on the sufficiency of the evidence is based on the contention that there is insufficient proof to show that he had a knife in his possession on the night of the subject fight, and the assertion that there is insufficient evidence to show that he had a specific intent to commit the crime of assault with a deadly weapon. ■ The latter contention was authoritatively settled recently in *People* v. *Hood*, 1 Cal.3d 444, 458 [82 Cal.Rptr. 618, 462 P.2d 370], where it was held that the offense is not one requiring specific intent.

■ In the instant case there was both direct and circumstantial evidence of considerable substantiality that defendant assaulted both Miller and Bressman with a deadly weapon. The evidence that both Miller and Bressman received severe cuts from a sharp instrument is uncontradicted, as is the evidence that Bressman did not strike defendant or take any swings at him. Mrs. Davis, Miller, January and O'Shea all saw defendant holding the knife either before or after defendant's attacks on Miller and Bressman. Stierna saw defendant with what appeared to be a knife. Later, he pried a knife with a broken blade from defendant's hand. There is no evidence that any other person involved in the altercation except January was carrying a knife. January testified that he carried a pocket knife on the night in question but that he did not "have the knife out." At the trial he produced the knife and showed it to the jury.

## Miranda Warning

■ Defendant contends that the waiver of his *Miranda* rights was involuntary because of self-induced intoxication. This challenge is apparently directed to the voluntariness of the waiver rather than to the voluntariness of the statement itself.

■ We observe, initially, that self-induced intoxication will not by itself render a statement involuntary. (*People* v. *Byrd*, 42 Cal.2d 200, 211 [266 P.2d 505] (cert. den. 348 U.S. 848 [99 L.Ed. 668, 75 S.Ct. 73]; overruled on other grounds, *People* v. *Green*, 47 Cal.2d 209, 229-232 [302 P.2d 307], and *People* v. *Morse*, 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]); *People* v. *Dorman*, 28 Cal.2d 846, 854 [172 P.2d 686].) ■ In any event, the statements made by defendant while he sat in the patrol car were unquestionably admissible because they were spontaneous statements volunteered by him. (*Miranda* v. *Arizona*, 384 U.S. 436, 478 [16 L.Ed.2d 694, 725-726, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Green*, 236 Cal.App.2d 1, 12 [45 Cal.Rptr. 744]; *People* v. *Charles*, 66 Cal.2d 330, 342 [57 Cal.Rptr. 745, 425 P.2d 545].)

■ Adverting to the statement concerning the incident which defendant gave to Officer Rasmussen at the police station following his arrest, we note that the matters contained in such statement that were brought to the attention of the jury were used for impeachment purposes only. ■ Assuming that the statement elicited at the police station was obtained in violation of the conduct proscribed in *Miranda,* such statement could nevertheless be used for the limited purpose of impeachment when defendant took the stand. (*Harris* v. *New York,* 401 U.S. 222, 226 [28 L.Ed.2d 1, 5, 91 S.Ct. 643].)

The rationale of *Harris* is that the shield of *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances, and that when a defendant voluntarily takes the stand he is under an obligation to speak truthfully. We are persuaded by this rationale, notwithstanding the rule that state courts may grant broader constitutional rights than those required by the federal Constitution.

We are not unmindful of our holding in *People* v. *Green, supra,* 236 Cal.App.2d 1, 16, that statements obtained in violation of *Dorado* (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) may not be used by the prosecution to impeach a defendant. Our holding in *Green* was predicated upon the conclusion that nothing in the language of *Dorado* and other subsequent California Supreme Court cases applying the *Dorado* rule suggested or indicated that any distinction should be made between the affirmative use of admissions obtained contrary to the proscription of *Dorado* and the use of such admissions by way of impeachment. (236 Cal. App.2d at pp. 16-17.) We believed that this conclusion was impelled by the language in *Escobedo* (*Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]) that ". . . no statement elicited by the police during the interrogation may be used against him [the defendant] at a criminal trial." (*Escobedo,* p. 491 [12 L.Ed.2d at p. 986]; *Green,* p. 17.) *Harris* does not interpret *Escobedo* as narrowly as we did in *Green,* but apparently restricts the language we have alluded to in *Escobedo* to a statement elicited by the police which is used against the defendant as part of the prosecution's case in chief.

We apprehend that California cases give support to the rationale of *Harris.* In *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], the Supreme Court, as a basis for its holding that the *Dorado* rule was not to be applied retroactively, recognized the distinction between an involuntary admission and a voluntary admission obtained without advising the accused of his right to counsel or to remain silent upon the rationale that admissions obtained by coercion are untruthful because coerced, but that this

unreliability is not inherent in admissions obtained under the proscription of *Dorado*. (At pp. 372-378.) The rationale of *Lopez* is also implicit in the holding of *People* v. *Underwood,* 61 Cal.2d 113, 120-121 [37 Cal.Rptr. 313, 389 P.2d 937], that involuntary admissions, as well as involuntary confessions, are not admissible to impeach the testimony of the accused. Accordingly, in the absence of any direct and express pronouncement on this question by the California Supreme Court, we are disposed to follow the holding in *Harris*.

In any event, the surrounding circumstances refute defendant's contention that his waiver was involuntary. Defendant was not intimidated by his arrest. He called Sergeant Busey, whom he apparently knew personally, over to the patrol car to tell him of his desire to kill Miller. He volunteered that same wish to Officer Fogarty. The portions of the statement given to Officer Rasmussen at the police station, which were used by the district attorney to impeach defendant's in-court testimony, indicate that defendant gave a detailed account of the altercation to the police and suggest that defendant knew what was happening and what he was doing when he gave the statement. Moreover, on cross-examination, defendant stated he remembered giving the statement at the police station and remembered that he was advised of his rights by Rasmussen, and stated that having these rights in mind he went ahead and gave the statement.

Finally, even assuming it was error to admit defendant's statement for purposes of impeachment, any error was harmless. It is not more probable, in view of the eyewitness accounts to the incident, that a result more favorable to defendant would have resulted in the absence of the use of such statement. (*People* v. *Watson,* 46 Cal.2d 818, 835-838 [299 P.2d 243].)

### *Misconduct*

Defendant contends that he was deprived of a fair trial because of the alleged misconduct of the district attorney. Specifically, he alleges that the district attorney used "inflammatory words" in his opening statement, such as, that defendant "exploded" and that defendant "kept right on coming and was using the knife in a whirling fashion . . . , chopping on Mr. Bressman in a fashion like this"; that the district attorney used leading questions in his examination of the witnesses; that the district attorney made attempts to show the jury pictures of the wounds sustained by Miller and Bressman in the altercation while the pictures were being identified by Miller, even though the pictures were not admitted into evidence. We find none of the conduct complained of to constitute prejudicial misconduct.

A prosecutor is entitled to "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " (*People* v. *Bandhauer,* 66 Cal.2d 524, 529 [58 Cal.Rptr. 332, 426 P.2d 900] (cert. den. 389 U.S. 878 [19 L.Ed.2d 167, 88 S.Ct. 178])); and he "may use appropriate epithets warranted by the evidence. . . ." (*People* v. *Mitchell,* 63 Cal.2d 805, 809-810 [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Hardy,* 271 Cal.App.2d 322, 330 [76 Cal.Rptr. 557].) We apprehend, moreover, that " '[T]he term "misconduct" implies a dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods [citations]. . . .' " (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].)

Here, the conduct complained of was not "misconduct" in the contemplation of these principles. In any event, we perceive that the ultimate question is whether the conduct of the district attorney was prejudicial. Unless we can say, after a review of the entire cause, that it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant, such conduct is not prejudicial. (*People* v. *Beivelman, supra,* at p. 75.) Here a review of the record impels us to answer that question in the negative.

Adverting to the claim of misconduct based on the prosecutor's use of leading questions in his examination of the witnesses, we do not perceive such method of questioning to constitute prejudicial misconduct in the absence of any showing that such examination had the effect of deliberately producing inadmissible evidence or called for inadmissible and prejudicial answers. A perusal of the questions complained of discloses that they did not produce inadmissible evidence or prejudicial answers, but evidence that could properly have been elicited by questions not objectionable in form. Assuming such impropriety, defendant may not claim error when he did not object or make an assignment of error. (*People* v. *Swayze,* 220 Cal. App.2d 476, 497 [34 Cal.Rptr. 5]; *People* v. *Asta,* 251 Cal.App.2d 64, 87 [59 Cal.Rptr. 206].) Defendant has not demonstrated, moreover, that the claimed error was such that any prejudicial effect could not be erased by a mere admonition. (See *People* v. *Bandhauer, supra,* 66 Cal.2d 524, 530; *People* v. *Love,* 56 Cal.2d 720, 733 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)

As part of foundational questioning the prosecutor showed a witness pictures of Miller's arm and Bressman's wounds. The pictures were ruled objectionable on the ground that their probative value was outweighed by their prejudicial effect. The pictures were not seen by the jury. Under these circumstances we perceive no prejudicial error.

## *Incompetency of Counsel*

 Incompetency of counsel is predicated upon trial counsel's failure to make "proper objections," the failure to make an opening statement, and permitting defendant to testify in narrative fashion. In *People* v. *Pineda,* 253 Cal.App.2d 443 [62 Cal.Rptr. 144], this court analyzed the matter of competency of counsel as follows: " 'Competency and effectiveness of counsel has been generally divided by the courts into two areas. Competence in the sense of strategy, tactics, and judgment exercised by the counsel during his conduct and control of the case [citations] or competence or lack of it when the attack is made because of a lack of knowledge of the law [citation] or lack of preparation and investigation exhibited by his counsel. [Citation.] In respect of the latter situation, the court held in *Ibarra* [*People* v. *Ibarra,* 60 Cal.2d 460 (34 Cal.Rptr. 863, 386 P.2d 487)] at p. 464: "To justify relief on this ground, 'an extreme case must be disclosed.' [Citations.] It must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.' [Citations.] . . ." ' " (At pp. 468-469.)

In the present case the criticized actions fall in the area of trial tactics. It is not necessarily true, as defendant asserts, that the testimony of the prosecuting witnesses would have had less force if defense counsel had objected to the form of the questions. A witness's mere affirmation of an attorney's question may have less impact on the jury than an answer in the witness's own words. Defense counsel's direct examination of his own witnesses indicates that he favored testimony more narrative in nature. He might well have thought that the district attorney was damaging his own case. It must also be noted that defense counsel did subject the People's witnesses to extensive cross-examination. The fact that he did not voice all possible objections during the district attorney's direct examination does not necessarily suggest poor or inadequate representation. As stated in *People* v. *Perry,* 271 Cal.App.2d 84, 114-115 [76 Cal.Rptr. 725]: " 'The failure of counsel to object at the trial does not ordinarily indicate either incompetence of counsel or unfairness to the client. The system of objections is a useful tool in the hands of a trained professional for the exclusion of matter which should not be received into evidence. But the indiscriminate use of objections, solely because they are available, aids neither the client nor the cause of justice. The choice of when to object and when to allow the evidence to come in as offered is inherently a matter of trial tactics. Ordinarily the tactical decisions of trial counsel will not be reviewed with the hindsight of an appellate court. [Citations.] . . .' "

 The decision to elicit a narrative account from one's own witness is also a tactical one. In certain situations, a narrative account may be

472

more beneficial to the party calling the witness. In the absence of strong showing that the client has been substantially prejudiced, trial counsel should not be second-guessed as to his decision to permit a client to testify in narrative fashion. By the same token, he should not be criticized for failure to make an opening statement. Defense counsel is not obliged to make an opening statement. (See Pen. Code, § 1093.) Whether he does so or not rests in his discretion. The sole purpose of an opening statement is to outline facts upon which an acquittal will be sought. (*People* v. *Nelson*, 224 Cal.App.2d 238, 252 [36 Cal.Rptr. 385]; *People* v. *Stoll*, 143 Cal. 689, 693 [77 P. 818].) It is a matter of long-recognized trial tactics for a defense lawyer to withhold informing the prosecution of the facts upon which his defense is based by waiving an opening statement.

 Defendant does not contend that any of the criticized tactics resulted in the withdrawal of a crucial defense. From the entire record, we conclude that none of the judgmental decisions of trial counsel are of such magnitude as to have reduced the trial to a farce or a sham. (Cf. *People* v. *Simms*, 10 Cal.App.3d 299, 313-316 [89 Cal.Rptr. 1]; *People* v. *Hurd*, 5 Cal.App.3d 865, 881-882 [85 Cal.Rptr. 718]; *People* v. *Perry, supra,* 271 Cal.App.2d 84, 110-117.)

### The Sentence

 Finally, defendant contends that "Inasmuch as defendant had never been previously convicted of a felony, the ends of justice would have been served by the judge sentencing defendant to county jail and thus having this first offense considered to be a misdemeanor." No authority is cited for this proposition.

Defendant was sentenced on two counts to state prison for the term provided by law. Since consecutive sentences were not specified, the sentences are concurrent. (*In re Patton,* 225 Cal.App.2d 83, 87-88 [36 Cal.Rptr. 864].) Defendant concedes that under Penal Code section 245, and pursuant to Penal Code section 17, the court had the discretion to sentence him either to the state prison or to the county jail. The penalty, therefore, was not excessive.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.