Opinion
TAYLOR, P. J.
Defendant, Louis Straiten, appeals from a judgment of conviction entered on a jury verdict finding him guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)). He contends that: 1) he was deprived of his constitutional right to a free transcript of his first trial; 2) the court erred by failing to give his proffered instruction on defense of property (CALJIC No. 5.43); 3) he was prejudiced by the admission of photographs of the victim; and 4) the prosecution was guilty of prejudicial misconduct by introducing testimony about the prior proceedings and deliberately misstating the evidence. We have concluded that there is no merit to any of these contentions and that the judgment must be affirmed.
*530 Although there are no contentions concerning the sufficiency of the evidence, a detailed chronology of the facts is essential for a discussion of the issues on appeal. Viewing the record most strongly in favor of the judgment, the following appears: Defendant and his wife Rose had a stormy relationship. On one occasion several years before the assault, Mrs. Straiten suffered from an overdose of drugs, called her cousin, Mrs. Velma Staff, and was taken to the hospital by Mrs. Staff and several other relatives, including Mrs. Staff’s two brothers. At this time, Mrs. Straiten told Mrs. Staff that defendant had forced her to consume the drugs.
Mrs. Straiten had also discussed her marital problems with her supervisor. On April 1, 1976, defendant returned home from a two-week trip east to visit his critically ill mother. A domestic argument ensued about Mrs. Straiten’s overnight trip to Reno during his absence. On April 2, 1976, Mrs. Straiten was upset and left her job about 1:45 p.m. She sounded upset when she called her uncle, L. Smith, and asked him to help her move that evening. Smith, the stepfather of Mrs. Staff, became excited and told Mrs. Staff about the call after she returned home from work.
Mrs. Staff telephoned the Straiten home and heard “Oh my God, Louis, don’t do it,” followed by a click as the phone was disconnected. She redialed but the call was again abruptly terminated. She called a third time and asked to speak to defendant. He said: “You’re always getting your goddamn family mixed up in our affairs.” Then the telephone was again disconnected. Mrs. Staff did not think that Mrs. Straiten, with whom she had a close relationship, was being threatened by defendant. However, Mrs. Staff decided to visit the Straiten home to tell Mrs. Straiten not to upset her stepfather, who was suffering from high blood pressure, and to assure defendant that her family did not want to get involved in the Straitens’ domestic problems.
Around 6 p.m., about half an hour after the series of telephone calls, Mrs. Staff arrived at the Straiten home in San Francisco and knocked on the door. She was let in by one of the Straiten children and waitéd in the hallway near the stairs while the boy went upstairs to tell his parents of her arrival. First, Mrs. Straiten came down, visibly upset. Defendant was behind her and began arguing with Mrs. Staff. During the heated argument, defendant pushed Mrs. Staff against the wall, bruising her arm. Mrs. Staff turned to leave and reached into her coat pocket for her car keys. Her cigarettes and lighter were also kept in the same coat pocket. As she did so, she saw defendant reach into his waistband. Mrs. *531 Staff then heard a loud noise in her right ear and remembered falling backward to the floor in slow motion. Then she saw that defendant held a gun pointed at her neck. Mrs. Staff believed she was welcome in the Straiten home and never threatened defendant with any type of weapon.
Defendant searched Mrs. Staff’s pockets while she quietly cried. Mrs. Straiten refused to get involved. Mrs. Staff felt a burning sensation in her neck and face, as well as a numbness in her hip. Mrs. Staff believed that the numbness was a result of her fall on the small paring knife that she usually carried to peel the fresh fruit required by her dental problems. She asked Mrs. Straiten to check; Mrs. Straiten indicated that the knife was not in the coat pocket.[1] Mrs. Straiten called the police; defendant took the telephone from her, admitted the shooting, and asked for help for Mrs. Staff Mrs. Staff sustained permanent paralysis from a gunshot wound fired at close range.
San Francisco Police Officer Heffeman, who responded after the shooting had been reported, was met by Mrs. Straiten. She told Heffernan that: 1) defendant shot Mrs. Staff; 2) Mrs. Staff had come over at her request; 3) she and defendant had been having an argument; 4) defendant became very upset after he discovered that she had called a relative; and 5) before the shooting, defendant pushed Mrs. Staff. Mrs. Straiten gave Heffeman a paring knife, cigarettes and a lighter.
When Heffernan handcuffed defendant in the kitchen, defendant said: “Yes, I shot her. The gun is on top of the refrigerator.” Heffeman there found a revolver in operable condition with five live rounds and one spent round; 12 pounds of pressure were required to fire this weapon.
Later that evening, Inspector Robert Kafka interviewed defendant. After proper admonishment and waiver, defendant indicated that his wife had called her cousin, Mrs. Staff (whom he claimed never to have met) to mitigate a domestic quarrel. He didn’t like Mrs. Staff, who had a bad disposition, and put the gun into his belt, as he was uncertain whether Mrs. Staff had brought any men with her. During the argument that ensued after Mrs. Staff arrived, she reached into her pocket. Defendant fired as he thought Mrs. Staff was reaching for a gun.
Kafka also interviewed Mrs. Straiten who told him that she and defendant had argued about an unannounced trip she had taken while *532 he was in the east visiting his sick mother and that defendant had choked and hit her. She intended to bail defendant out and then leave him.
The same evening, Mrs. Straiten also talked to Mrs. Staff’s brother, George, and told him she and defendant had had a spat. She told Mrs. Staff she didn’t want to get the family involved. Mrs. Staff came over. After defendant pushed Mrs. Staff, she told him that the family would hold him responsible for any injuries inflicted on Mrs. Straiten. Mrs. Staff then turned to leave, reached into her pocket for her keys, and was shot by defendant.
The defense was primarily one of justification. Mrs. Straiten indicated that she called Smith to ask him for the use of his truck to ship certain articles to relatives in the east and to Goodwill, not to move out of the home. She denied that there had been any argument about the Reno trip with defendant that day. She asked to leave work early that day as a check bounced and she was upset about that and wanted to take care of it. She denied the existence of any marital problems or ahy discussions about the subject with her supervisor. She also denied all of the statements she had made to the police on the evening of the shooting or giving the officers the cigarettes, cigarette lighter and paring knife. The paring knife was on top of the freezer. She explained the drug overdose incident as her own unfortunate attempt to combatxmigraine headache while defendant was at work and without his knowledge. She denied telling Mrs. Staff that defendant had forced her to consume the drugs.
On the evening of the shooting, she specifically told Mrs. Staff not to come over. After Mrs. Staff came, Mrs. Straiten asked her to leave. Mrs. Staff indicated she wanted to talk to defendant. Defendant then told Mrs. Staff to leave and gripped her arm for emphasis., Mrs. Staff shook loose, said, “Okay, goddamn it, come on” and put her hands in her pocket. Defendant pulled a gun that accidentally fired when she grabbed his arm. Defendant asked Mrs. Staff whether she had anything in her pocket. Mrs. Staff first indicated to him that only her cigarettes and lighter were in the pocket but then threw or pulled the paring knife out of her coat pocket. Immediately after the shooting, defendant was contrite and appeared to be in shock about it. Mrs. Straiten had had arguments with Mrs. Staff and seen her carrying a knife.
Defendant also testified that the day’s discussions about Mrs. Straiten’s Reno trip had been calm and cool. He armed himself because Mrs. Staff *533 had previously brought men[2] to the house. He was also frightened when Mrs. Staff indicated that she wanted to talk to him, although he had never seen her use a gun or knife; however, he had seen Mrs. Staff use a broken glass in a quarrel with another woman. Defendant asked her to leave his house three times and grabbed her arm to assist her. He fired after Mrs. Staff reached into her pocket and said “That’s right, goddamn it, come on!” He did not mention this fact to the police after the shooting because he was not asked about it.
William Brooks, a longtime friend of defendant’s, had been with him all day on April 2, just after defendant returned from his vacation in the east. Mrs. Straiten did not arrive early. Brooks left to get some beer and after he returned, remained in his car across the street. He saw a woman at the door fiddling with her coat[3] as if to put something in it and then abruptly enter the Straiten home. He denied the existence of any domestic problems between the Straitens. Defendant’s friend Brown testified that defendant’s gun had been defective the previous summer.[4]
Defendant, relying on People v. Hosner, 15 Cal.3d 60, 65-66 [123 Cal.Rptr. 381, 538 P.2d 1141] first argues that he is entitled to an automatic reversal because of the violation of his constitutional right to a free transcript of the first trial. Hosner, however, conditions the right to such a transcript on proof of indigency and a timely motion before the second trial. Defendant failed to meet both of these conditions. As to the first, while his counsel stated that defendant was indigent, the record indicates that: 1) defendant’s trial counsel, Mr. Briggs, was substituted for prior retained counsel; 2) at the time of the second trial, defendant was employed (People v. Westbrook, 57 Cal.App.3d 260, 264 [129 Cal.Rptr. 143]). As to the second, no request for a transcript of the first trial was made until the cross-examination of defendant’s witnesses. The failure of defense counsel to make a timely request for a transcript prior to the second trial can either be seen to be a tactical decision[5] or as an indication that defense counsel did not think the transcript of the first trial was needed at the second. In addition, defendant has not raised any *534 contentions concerning the ineffective assistance of counsel at the second trial. We can only conclude that there is no merit in his first contention.
Next, defendant complains of the court’s failure to give his requested instruction on defense of property, CALJIC No. 5.43, set forth below.[6] Contrary to defendant’s assertion, the trial court did not indicate that this instruction would be given. The record indicates that the court stated it gave the self-defense instructions, and gave CALJIC No. 5.42, set forth below,[7] pertaining to defense of property against a trespasser.[8]
Defendant argues that-the instruction given did not fully inform the jury as to the amount of force he was privileged to use on a trespasser and left the jury with the impression that his action was improper and that he was the aggressor rather than Mrs. Staff. However, on this very issue, CALJIC No. 5.42 is more complete and explicit than CALJIC No. 5.43. Further, defendant’s contention ignores the major significant difference between the two instructions: CALJIC No. 5.42 emphasizes the self-defense aspects and is given properly when the threats are against a person in his home or the likelihood that a felony will be committed (People v. Smith, 249 Cal.App.2d 395, 401 [57 Cal.Rptr. 508]). It was appropriate here where the threat was to the habitation interest, based on the common law concept of a man’s dwelling as “his castle” (1 *535 Witkin, Cal. Crimes, § 165, subd. (a)(b), pp. 157-158). In contrast, CALJIC No. 5.43 is appropriately given where the threat is to ordinary, real or personal property (People v. Dunn, 39 Cal.App.3d 418, 421 [114 Cal.Rptr. 164]). There was no evidence that Mrs. Staff ever presented any threat to real or personal property. Accordingly, CALJIC No. 5.43 was properly refused and the jury fully and fairly instructed on all aspects of the defense evidence.
Defendant also asserts that the court erred to his prejudice by admitting into evidence a photograph showing Mrs. Staff’s wounds and powder burns. Defendant asserts that its inflammatoiy effect outweighed its probative valiie. However, we do not think that the trial court abused its discretion in resolving this question in favor of admissibility (People v. Robles, 2 Cal.3d 205, 217 [85 Cal.Rptr. 166, 466 P.2d 710]). Mrs. Staff testified only that she felt a burning sensation and was told this sensation was the result of the powder burns. The photographs provided objective verification of the powder burns. In addition, the powder burns provided the basis for the conclusion of the prosecution’s expert that the weapon was fired at the victim at a very close range. Also, Mrs. Staff’s participation at the trial in her paralyzed condition was far more emotionally charged and potentially inflammatory than the photographs. We can only conclude that defendant failed to meet his burden of demonstrating an abuse of discretion (People v. Steger, 16 Cal.3d 539, 553 [128 Cal.Rptr. 161, 546 P.2d 665]).
Defendant’s contentions concerning several instances of prejudicial misconduct by the prosecution are equally without merit. He first maintains that the prosecution “testified” that Mrs. Straiten at the first trial never stated that after defendant put his hands on Mrs. Staff to show her to the door that Mrs. Staff reached into her pocket and said: “Goddamn it, you go ahead.” The record, however, indicates that the prosecution properly attempted to impeach Mrs. Straiten’s testimony on this matter, as it was first elicited on direct examination. Subsequently, Mrs. Straiten admitted that she did not mention the matter at the prior trial as she. was not asked.
Defendant next asserts that in the cross-examination of Mrs. Straiten, the prosecution improperly inferred that she had fabricated evidence as to the location of the paring knife at the time of the shooting. The record, however, indicates that immediately after the shooting, defendant and Mrs. Straiten searched Mrs. Staff’s coat pocket. Only cigarettes and a lighter were found; the paring knife was not there. Mrs. Staff initially believed the paring knife was in her pocket; however, after *536 Mrs. Straiten did not find it there, Mrs. Staff indicated that it was in the purse in her car. Mrs. Staff overheard the telephone call to the police and believed that no one left the house but was vague as to what occurred thereafter until her hospitalization. The cardboard sheath used to cover the knife was subsequently found by the police in Mrs. Staff’s purse in her car. The paring knife, however, was either handed to the police by Mrs. Straiten or found by the officers in the Straiten kitchen. The above evidence and the devastating effect on the theory of self-defense of the location of the paring knife in the victim’s car, instead of in her possession, reasonably led to an inference of fabrication. Accordingly, the prosecution’s question was within the scope of cross-examination (People v. Hayes, 19 Cal.App.3d 459, 469-470 [96 Cal.Rptr. 879]).
Defendant also complains that the prosecution improperly implied that Mrs. Straiten had taken a drug “overdose” by asking whether her life was saved on the earlier occasion when she was taken to the hospital by Mrs. Staff’s two male relatives. The record, however, indicates that the term “overdose” as to that occasion was first used by defense counsel in his cross-examination of the victim. Mrs. Straiten also admitted on cross-examination that she knew her stomach had been pumped. Thus, the question was proper and highly relevant on the major defense theory of justification, based in part, on defendant’s féar that Mrs. Staff had several men with her. In conclusion, we reiterate that none of the above described matters constituted prosecutorial misconduct which implies a dishonest act or an attempt to persuade the court or jury by deceptive or reprehensible methods (People v. Hayes, supra, at p. 470).
The judgment is affirmed.
Kane, J., and Rouse, J., concurred.
A petition for a rehearing was denied July 27, 1977, and appellant’s petition for a hearing by the Supreme Court was denied August 25, 1977.

The cardboard shield that usually covered the knife was later found in Mrs. Staff’s purse, which had been left in her car.

This was a reference to the occasion when Mrs. Staff brought her brothers, George and Frank, as well as several other relatives, to take Mrs. Straiten to the hospital after her drug overdose.

Brooks had not mentioned this fact at the first trial.

The defective gun. however, had a longer barrel than the one used to shoot Mrs. Staff.

The inconsistencies in the testimony of defendant and his wife in the two trials as to the statement made by Mrs. Staffjust before the shooting support this assumption.

“When conditions are present which, under the law, justify a person in using force in defense of property, he may use such degree and extent of force as would appear to a reasonable person, placed in the same position, and seeing and knowing what the resisting person then sees and knows, to be reasonably necessary to prevent imminent injury threatened to the property. Any use of force beyond that limit is regarded by the law as excessive and unjustified, and a person using such excessive force is legally responsible for the consequences thereof.”

“The lawful occupant of real property has the right to request a trespasser to leave the premises. If the trespasser does not do so within a reasonable time, such occupant may use force to eject the trespasser.
“However, the amount of force which may be used to eject the trespasser is limited by what would appear to a reasonable person under the existing circumstances to be necessary.
“A person may defend his home or habitation against anyone who manifestly intends or endeavors, in a violent or riotous manner, to enter that home or habitation, and who appears to intend violence to any person in that home.
“The amount of force which the person may use in resisting such trespass is limited by what would appear, to a reasonable person, in the same or similar circumstances, necessary to resist the violent and unlawful entry.
“He is not bound to retreat, even though a retreat might safely be made.
“He may resist force with force, increasing it in proportion to the intruder’s persistence and violence, if the circumstances which are apparent to the home owner are such as would excite a similar belief in a reasonable person under similar circumstances.” (CALJIC No. 5.42, 1974 revision.)

The instruction was given initially and then repeated at the jury’s request during its deliberations.