[Crim. No. 15600. In Bank. Oct. 20, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
EARL TAYLOR, Defendant and Appellant.

## COUNSEL

William P. Quigley, under appointment by the Supreme Court, and William J. Adams, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, Edsel W. Haws and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant appeals from a judgment of conviction entered upon jury verdicts finding him guilty of possession of heroin (Health & Saf. Code, § 11500) and possession of a restricted dangerous drug (Health & Saf. Code, § 11910).

He contends principally that the court committed prejudicial error in permitting the prosecutor to impeach his testimony by means of illegally obtained evidence. On the facts of this case, the contention must be sustained and the judgment reversed.

About 9 p.m. on April 16, 1969, defendant was driving on a state highway near Los Gatos with Ethel Riggiola as a passenger in the front seat. A police officer stopped defendant for failing to dim his headlights, and after a radio check disclosed that the car he was driving was stolen, arrested him and his companion on that charge. A series of police searches, the legality of which is not here questioned, revealed various articles of contraband in and about the vehicle. Thus a narcotics injection kit was found on the floor under the seat in which Riggiola was sitting; a small coin purse containing several balloons of heroin was found lying on the front seat midway between the passenger's and driver's side; and 21 amphetamine tablets were found in a Pall Mall cigarette package hidden behind the dashboard. In addition, an attache case belonging to defendant was lying on the back seat; according to police testimony the case was found to contain, among other items, two unopened packets of balloons.

In a statement to the police after her arrest Riggiola said the narcotics found in the car were not hers but defendant's, that she was an addict, and that defendant supplied all the narcotics she used. As the principal witness for the prosecution at defendant's trial, Riggiola subsequently testi-

fied that she and defendant had lived together during the week before the arrest. They met in Los Angeles, traveled to Oakland and San Francisco, and were returning to Los Angeles when they were stopped. During this trip she gave defendant money which she earned from prostitution, and he supplied her with heroin. She first saw the coin purse containing the heroin in defendant's hotel room in Los Angeles, and thereafter saw it in his possession several times on the trip. She described how defendant prepared the heroin and put it into balloons, and how he helped administer the narcotic to her.

Defendant took the stand in his own behalf. His counsel limited his entire direct examination to the following few questions and answers:

"By Mr. VIERRA: Q. Would you state your name, please, sir? A. Earl Taylor.

"Q. Mr. Taylor, you are the defendant in this action, are you not? A. Yes, I am.

"Q. Mr. Taylor, I will show you a little coin purse marked People's Exhibit No. '1'. Is that your purse? A. No, that's not my purse.

"Q. Mr. Taylor, this purse contains heroin. Does the heroin in that purse belong to you? A. No, sir.

"Q. Mr. Taylor, have you ever possessed this purse, People's Exhibit No. '1'? A. No, sir.

"Q. Mr. Taylor, I will show you a Marlboro, excuse me, Pall Mall package, People's Exhibit No. '3'. Does that belong to you? A. No, sir.

"Q. Do any of the contents of that package that [sic] belong to you? A. No.

"Q. Have you ever seen that before today? A. No.

"Q. Have you ever seen that? A. Yes, wait. I did see it. I seen it at the preliminary wrapped in that manner, and I also seen it during the mistrial. I seen it twice prior before then. Each time in the courtroom.

"Q. You also saw the little purse? A. I also saw the little purse, also.

"Q. Do any of the other contents in the purse belong to you? A. No, sir.

"Mr. VIERRA: No further questions."

Over repeated but unsuccessful objections that the questioning exceeded the scope of the direct examination, the prosecutor was permitted to conduct an elaborate cross-examination. Thus he asked whether defendant

had previously seen the two packets of unused balloons which the police testified they found in the attache case. Defendant replied in the negative. The prosecutor then asked whether defendant had ever seen "any" balloons before. Not surprisingly, defendant said he had. Broadening the inquiry, the prosecutor asked, "Have you ever seen narcotics before?" Explaining that he had been raised "in the lower-class section of the town," defendant said he had seen marijuana cigarettes and pills called "red devils." The prosecutor then asked defendant if he had ever seen heroin before. Defendant replied he had seen the rubber bags in which it is packaged, but had not seen their contents. Pressing still further, the prosecutor inquired, "did you ever have in your possession a balloon containing heroin in your life?" Defendant answered, "No, not to my knowing." Finally the prosecutor asked, "Were you ever arrested with a balloon of heroin in your possession?"

At this point defense counsel invoked the decisions of the United States Supreme Court in *Agnello* v. *United States* (1925) 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4, 51 A.L.R. 409], and *Walder* v. *United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354], which we discuss in detail below. After a lengthy hearing in chambers, the court ruled that the prosecutor's inquiry was not barred by *Agnello* and *Walder*. In response to the pending question, defendant then conceded that in Los Angeles sometime earlier a police officer "stopped me on a corner and searched me and my pockets and he went in my pocket and he jerked his hand out of the pocket and came up with a little piece of balloon in his hand and he asked me did I ever see that before." Defendant testified he had not put the balloon into his pocket, thus permitting the inference that it was the officer who had done so.

To rebut this inference the prosecutor called Police Sergeant Luther McCormick, who had witnessed the prior search of defendant. He testified that the police first observed the defendant at 5:45 a.m. traversing an intersection in the crosswalk. His gait was slow and deliberate, with a slight stagger, and he appeared to be "under the influence of something." Defendant was stopped and patted down "solely for weapons." In the course of that pat-down, the investigating officer reached into defendant's shirt pocket and removed the balloon of heroin. Defense counsel objected on the ground the search was illegal under *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], and *Sibron* v. *New York* (1968) 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889]. The prosecutor conceded the illegality of the search, but asked that the evidence nevertheless be admitted for the purpose of impeachment. The trial court so ruled, and the witness was permitted to testify that he had seen nothing in the officer's

hand as it was thrust into defendant's pocket and that the balloon taken therefrom contained heroin.

The court subsequently instructed the jury that Sergeant McCormick's testimony was not admitted to prove the truth of the matters asserted therein, but to impeach defendant's credibility as a witness.

To begin with, it is not disputed that on the showing here made by the People the prior search of defendant in Los Angeles must be deemed to have violated both the state and federal constitutional prohibitions against unreasonable searches and seizures. (Cal. Const., art. I, § 19; U.S. Const., 4th and 14th Amends.) The search was illegal in its inception: the mere fact that defendant was observed apparently "under the influence of something" while lawfully crossing a street at an early hour did not give the police reasonable grounds to believe he was "armed and dangerous" within the meaning of *Terry* v. *Ohio* (1968) *supra,* 392 U.S. 1, 27 [20 L.Ed. 2d 889, 909], and *Sibron* v. *New York* (1968) *supra,* 392 U.S. 40, 64 [20 L.Ed.2d 917, 935]. The search was also illegal in its scope: it is settled that feeling a soft object in a suspect's shirt pocket during the course of a pat-down search for weapons does not justify further police intrusion into that pocket for any purpose of self-protection. (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 154 [98 Cal.Rptr. 649, 491 P.2d 1]; *People* v. *Collins* (1970) 1 Cal.3d 658, 662-663 [83 Cal.Rptr. 179, 463 P.2d 403]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 394 [82 Cal.Rptr. 379, 461 P.2d 659].) We have seen that at trial the prosecution conceded the illegality of the prior search of defendant, and the People do not contend otherwise on appeal.

Thus the controlling question is what use, if any, the prosecution could lawfully make of the evidence obtained by means of that unconstitutional search. By virtue of the exclusionary rule, of course, the People could not introduce the evidence as part of their case in chief in any criminal prosecution of defendant. (*People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]; *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].) We recently reiterated that the twofold purpose of this rule is "to deter law enforcement officers from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in such illegal conduct." (Fns. omitted.) (*Kaplan* v. *Superior Court* (1971) *supra,* 6 Cal.3d 150, 155-156.) Those goals would be ill served indeed if the People were permitted to do indirectly that which they are forbidden to do directly, and the courts have therefore been vigilant to prevent such circumventions. One device which has been firmly condemned is the introduction of evidence not itself seized in the illegal search but "come at by

exploitation of that illegality" (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 764 [44 Cal.Rptr. 313, 401 P.2d 921], and cases cited). Such exploitation is not here shown. Another technique employed by the People is the introduction of illegally obtained evidence not during their case in chief but in rebuttal, purportedly for impeachment, after the prosecutor has elicited contrary testimony of the defendant on cross-examination. It is this sequence which is under attack in the case at bar.

The stratagem, however, lacks originality. In *Agnello* v. *United States* (1925) *supra,* 269 U.S. 20, Frank Agnello and others were charged with conspiring to sell cocaine in violation of the federal Harrison Act. Government witnesses testified they saw Agnello deliver a number of small packages of cocaine to an undercover agent. In addition, the prosecution offered to prove during its case in chief that while Agnello and his codefendants were being taken to the police station after their arrest, other law enforcement officers conducted a warrantless search of Agnello's home some distance away and found a can of cocaine in his bedroom. The trial court ruled that the search and seizure were unconstitutional, and excluded the evidence.

Agnello took the stand in his own defense. On direct examination he testified only that he had received the packages from a codefendant but did not know their contents and would not have carried them if he had known they contained cocaine. On cross-examination the prosecutor was permitted to ask, over objection, "Did you ever see narcotics before?" Agnello replied in the negative. The prosecutor then produced the can of cocaine which the police claimed to have found in Agnello's home, and over objection asked if he had seen it before. Agnello answered that he had not. In rebuttal, again over objection, the prosecutor was permitted to introduce the previously excluded evidence of the search of Agnello's home and the seizure therein of the can of cocaine.

Reversing Agnello's conviction, the United States Supreme Court first held that the warrantless search and seizure could not be justified as an incident to Agnello's arrest or on any other ground, and hence that the evidence obtained thereby could not be used to incriminate him. (269 U.S. at pp. 30-34 [70 L.Ed. at pp. 148-150].) The court then turned to the precise issue now before us: "And the contention that the evidence of the search and seizure was admissible in rebuttal is without merit. In his direct examination, Agnello was not asked and did not testify concerning the can of cocaine. In cross-examination, in answer to a question permitted over his objection, he said he had never seen it. He did nothing to waive his

constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search. As said in *Silverthorne Lumber Co.* v. *United States* [251 U.S. 385] 392, 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.' The admission of evidence obtained by the search and seizure was error and prejudicial to the substantial rights of Frank Agnello." (*Id.* at p. 35 [70 L.Ed. at p. 150].)

The *Agnello* doctrine was reaffirmed by a process of distinction in *Walder* v. *United States* (1954) *supra,* 347 U.S. 62. There the defendant was indicted in 1950 for possession of a capsule of heroin, but that charge was dismissed after he successfully moved to suppress the evidence on the ground of illegal search and seizure. In 1952 he was indicted on a different charge of four sales of narcotics to government informers. The prosecution's case consisted principally of the testimony of these informers. The defendant took the stand, and in his direct testimony made the broad assertion that "I have never sold any narcotics to anyone in my life" and indeed had never even possessed any narcotics. He reiterated these claims on cross-examination. Over objection, the prosecutor was then allowed to question him about the heroin capsule seized in his home in 1950. The defendant denied that any narcotics were taken from him at that time, thereby contradicting the sworn affidavit he had filed in 1950 in support of his motion to suppress. In rebuttal, the prosecution was permitted to call an officer who had participated in the prior search and the chemist who had analyzed the heroin. This evidence was received only for impeachment, and the jury was so instructed. The defendant was convicted, and on appeal the Supreme Court stated the issue to be "whether the defendant's assertion on direct examination that he had never possessed any narcotics opened the door, solely for the purpose of attacking the defendant's credibility, to evidence of the heroin unlawfully seized in connection with the earlier proceeding." (*Id.* at p. 64 [98 L.Ed. at p. 506].)

The court began by restating the principles governing this issue: "The Government cannot violate the Fourth Amendment—in the only way in which the Government can do anything, namely through its agents—and use the fruits of such unlawful conduct to secure a conviction. [Citation.] Nor can the Government make indirect use of such evidence for its case [citation], or support a conviction on evidence obtained through leads from the unlawfully obtained evidence [citation]. All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." (Fn. omitted.) (*Id.* at pp. 64-65 [98 L.Ed. at pp. 506-507].)

The court then affirmed the conviction on the following reasoning (*id.* at p. 65 [98 L.Ed. at p. 507]): "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

· "Take the present situation. Of his own accord, *the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics.* Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (Italics added; fn. omitted.)

Far from overruling *Agnello,* however, the court "sharply contrasted" that decision in highly favorable terms: "There the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question 'Did you ever see narcotics before?' After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant. In holding that the Government could no more work in this evidence on cross-examination than it could in its case in chief, the Court foreshadowed, perhaps unwittingly, the result we reach today. . . ." (Fn. omitted.) (*Id.* at p. 66 [98 L.Ed. at p. 507].)

■ When carefully read in the light of their facts, *Agnello* and *Walder* thus stand for the proposition that in narcotics cases evidence of prior possession of contraband by the defendant that was obtained by means of an illegal search and seizure is admissible for the limited purpose of impeaching the defendant as a witness only if, on his direct examination, he makes a sweeping claim that he has never dealt in or possessed any narcotics; the evidence is not admissible for any purpose if the defendant merely denies committing the crime charged and it is the prosecutor who, on cross-examination, elicits an expected denial of his equally sweeping question asking if the defendant has ever engaged in narcotics activity before.

Applying this rule to the case at bar, we see that defendant's brief testimony on direct examination falls far short of the wholesale claim of ignorance of all narcotics, past and present, asserted by the defendant in *Walder*. Furthermore, here it was the prosecutor who abruptly broadened the inquiry by asking, on cross-examination, whether defendant had "ever seen narcotics before." This was the exact question condemned by the United States Supreme Court in *Agnello*.[1] When the question failed to elicit an outright denial, the prosecutor pressed on relentlessly[2] until defendant in effect denied possessing the contraband found in the prior unlawful search. Thereupon the prosecutor was permitted to introduce Sergeant McCormick's testimony assertedly to impeach that of defendant. But the sole testimony of defendant contrary to Sergeant McCormick's, as we have seen, was that extracted by the prosecutor himself on cross-examination. The trial judge perceived this fact, and in the course of argument correctly told the prosecutor, "I don't think that you are entitled on cross-examination to build a straw man."

■ It is contended, however, that defendant's testimony on direct examination should be deemed a "general denial of the crime of possession of narcotics"; that such a denial includes, by implication, a specific denial of the element of knowledge of the narcotic character of the substance which the defendant is charged with possessing; and that the challenged evidence of defendant's acquaintance with heroin was therefore admissible to contradict the latter implied denial. But the premise of this argument finds no support in the record: in his direct testimony defendant did not make a general denial of the crime of possession of narcotics, or indeed of any other crime. He simply testified that the coin purse and the cigarette package found by the police in the car in which he and Riggiola were arrested did not belong to him. Moreover, even if defendant had made such a general denial, there is a world of difference between a technically inferable negation of one element of the crime charged, and the explicit and "sweeping" claim of ignorance of all narcotics made by the defendant in *Walder*. A defendant who wishes to exercise his fundamental right to testify in his own behalf can scarcely say any less on the witness stand than was said in the present case.

---

[1] The striking similarity between this case and *Agnello* is not merely coincidental. As noted above, defense counsel specifically invoked *Agnello* and *Walder* in objecting to the prosecutor's line of questioning; and in arguing his objection to the court, counsel explained he had "purposely framed" his presentation to bring it within the rule of those two decisions.

[2] There is no substance in the People's claim that defendant "volunteered" the testimony that he had never before seen narcotics or, at least, heroin. Each such statement was made in answer to a direct question to the same effect by the prosecutor, and the inquiry was allowed only over repeated and strenuous objections by defense counsel.

If even that carefully limited testimony were held to authorize the prosecutor to embark upon a wide-ranging cross-examination for the purpose of laying a foundation for introducing illegally obtained evidence by way of "impeachment," nothing would remain of the *Agnello* rule. Recognizing this reality, the *Walder* court took the occasion to reiterate (347 U.S. at p. 65 [98 L.Ed. at p. 507]) that a defendant "must be free to deny all the elements of the case against him. . . ." Defendant here did no more.

Finally, we are not impelled to a different conclusion by *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]. In that case the defendant was charged with selling heroin to an undercover police officer on January 4 and 6, 1966. The defendant took the stand and denied selling anything to the officer on the first date charged. With respect to the second alleged sale, however, he told a more elaborate story: he testified that on January 6 he sold the officer two glassine bags containing a substance appearing to be heroin, but that it was only baking powder intended to deceive the officer into paying the $12 price. On cross-examination the defendant was asked whether he had given a statement to the police immediately after his arrest. He admitted making such a statement, but claimed he could not remember the questions and answers thereafter recited by the prosecutor. In the statement the defendant told the police that on each occasion charged he acted as a middleman to buy heroin from a third person with money furnished by the undercover officer, and in particular that the two glassine bags purchased on January 6 did contain heroin. The prosecution conceded the statement had been obtained in violation of the rules laid down in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and hence was inadmissible as part of its case in chief. The jury was accordingly instructed to consider the statement for impeachment purposes only, and it returned a verdict of guilt on the second count.

Affirming the conviction, the United States Supreme Court relied primarily on *Walder*. Both the majority and dissenting opinions emphasized that the extrajudicial statement "contradicted petitioner's direct testimony" (*id.* at pp. 223, 227 [28 L.Ed.2d at pp. 3, 5-6]). Quoting *Walder's* reasoning that the illegality of impeaching evidence *is no justification for* letting the defendant "affirmatively resort to perjurious testimony," the court concluded (at p. 226 [28 L.Ed.2d at p. 5]): "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior *inconsistent* utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier *conflicting* statements." (Italics added.)

*Harris* is thus factually distinguishable on the same ground as *Walder.* Here the defendant on direct examination offered no elaborate justification for his conduct, and the prior illegally obtained evidence was therefore not "inconsistent" or "conflicting" with that testimony. Defendant did not rely on the illegality of the impeaching evidence as a sword to commit perjury, but simply as a shield against the consequences of concededly improper police practices.

We conclude, for the reasons stated in *Agnello* and the explanation of that decision in *Walder,* that it was error of constitutional dimension to allow the prosecutor to inquire whether defendant had ever been arrested with a balloon of heroin in his possession, and to prove that fact over defendant's denial by the introduction of Sergeant McCormick's testimony.

On the record in this case the error cannot be deemed harmless. The circumstantial evidence was ambiguous at best. It is true the narcotics were found in a car driven by defendant. But he was not alone in the car. The passenger, Riggiola, was both a woman and a heroin addict; and the heroin found by the police was secreted in a woman's coin purse, not in a man's wallet, and was lying equidistant between the driver's seat and the seat occupied by Riggiola. Moreover, the cigarette package in which the amphetamine tablets were found was admittedly the brand smoked by the latter.[3] Thus the physical evidence pointed equivocally to possession of the contraband either by defendant, or by Riggiola, or jointly by both.

In these circumstances it was critical to the prosecution's case that the jury believe the truth of Riggiola's statement to the arresting officers and testimony at trial, in which she incriminated defendant both directly and as an aider and abettor of her possession and use of heroin. As a witness, however, Riggiola left much to be desired. An admitted heroin addict and prostitute, she was strongly under the influence of narcotics at the time of her arrest and even told the officers, "I need one [i.e., a restricted dangerous drug] so bad."[4] She later talked with defendant in jail about their predicament, and became angered at him when he chose to maintain his innocence. She then discussed the case with representatives of the district attorney's office. As she acknowledged on the stand, she was promised leniency in exchange for agreeing to testify against defendant. We observe

---

[3] As to the other narcotics-related evidence in the car, defendant denied the two packets of balloons assertedly discovered in the attache case belonged to him, while Riggiola admitted owning the narcotics kit found under her seat.

[4] An arresting officer testified she had needle marks in the veins of her hand, she was "quite giddy," her speech was thick and slurred, her reaction to light was slow, and several events of that evening seemed "very funny" to her.

that the prosecution apparently kept its part of the bargain. Riggiola was arrested for grand theft of the automobile in which she and defendant were riding, but no such charge was ever filed against her. And although the People now claim she could have been prosecuted for joint possession of the narcotics found in the car, that charge was not laid either.[5] Instead, she was permitted to plead guilty to the misdemeanor of possessing narcotics paraphernalia (Health & Saf. Code, § 11555), and at the time of trial had been told she would be sent to the state rehabilitation center for narcotics addicts.

The self-serving testimony of such a witness certainly does not furnish "overwhelming" evidence of the defendant's guilt within the meaning of *Harrington* v. *California* (1969) 395 U.S. 250, 254 [23 L.Ed.2d 284, 287-288, 89 S.Ct. 1726]. On the contrary, the case was a close one on its facts,[6] and in the final analysis pitted defendant's word against that of his deeply implicated companion. We cannot say that the jury, in performing its difficult task of choosing whom to believe, was not swayed in some degree by the prosecutor's use of illegally obtained evidence of prior heroin possession to impeach the testimony of defendant. It follows that the People have failed to sustain their burden of proving beyond a reasonable doubt that the error complained of did not "contribute to the verdict." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) A conviction predicated on such a record cannot stand.

Defendant's remaining contentions do not require discussion.

The judgment is reversed.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.**—I dissent. In my opinion under *Harris* v. *New York*, 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], the prosecutor was properly allowed to impeach defendant's testimony by the illegally obtained evidence. The majority purports to distinguish this case from *Harris* solely on the ground that here, unlike *Harris*, there was no inconsistency or conflict

---

[5]In addition, she admitted taking a pistol from her handbag and hiding it under the front seat with the narcotics kit at the time of her arrest. Yet in spite of the fact she was known to be addicted, she was apparently not charged with a violation of Penal Code section 12021 (prohibiting possession of a concealable weapon by a narcotics addict).

[6]It appears from the record that a first trial of defendant on these charges ended in a mistrial.

between the illegally obtained evidence and defendant's direct testimony, but, as we shall see, the jury could well have found that there was such an inconsistency. Furthermore, even if it be assumed that it was error to allow the prosecutor to impeach defendant's testimony by that evidence, I do not agree with the majority that the error was prejudicial. The Court of Appeal unanimously concluded that any error in permitting the impeachment was harmless in view of the overwhelming evidence of defendant's guilt, and I agree with that court's conclusion.

On direct examination, after denying that the coin purse marked People's Exhibit Number 1 and the heroin in the purse belonged to him, defendant was asked, inter alia, *"Mr. Taylor, have you ever possessed this purse, People's Exhibit No. '1'?"* and he replied *"No, sir."* Although ambiguous, defendant's italicized testimony, in light of the question asked, manifestly could be viewed by the jury as a general denial of the crime of possession of narcotics.[1]

Such a denial denies "every" fact essential to guilt. (Cf. *People* v. *Wong Sang Lung,* 3 Cal.App. 221, 223 [84 P. 843] [concerning not guilty plea]; Ballentine's Law Dictionary (3d ed.) p. 954 [same].) One fact essential to guilt of possession of narcotics is knowledge of the narcotic character of the substance possessed. (*People* v. *Newman,* 5 Cal.3d 48, 52 [95 Cal.Rptr. 12, 484 P.2d 1356]; *People* v. *Francis,* 71 Cal.2d 66, 73 [75 Cal.Rptr. 199, 450 P.2d 591].) The evidence that defendant on an occasion prior to the one resulting in the instant charges was arrested with heroin in his possession tended to contradict the denial of such knowledge that the jury could find implicit in defendant's italicized testimony. Thus the illegally obtained evidence served to impeach defendant's direct testimony, as well as testimony by defendant on cross-examination (e.g., that he had never seen heroin). One method of impeachment is, of course, contradiction (Evid. Code, § 780, subd. (f); *Curry* v. *Superior Court,* 2 Cal.3d 707, 715 [87 Cal.Rptr. 361, 470 P.2d 345]), and the contradictory evidence may be either direct (see *Curry* v. *Superior Court, supra*) or circumstantial (see *People* v. *Barrow,* 62 Cal.App.2d 590, 596-597 [145 P.2d 42]).

In *Harris* v. *New York, supra,* 401 U.S. 222, which involved the question whether a statement inadmissible under *Miranda* v. *Arizona,* 384 U.S.

---

[1]The majority opinion is misleading in stating "in his direct testimony defendant did not make a general denial of the crime of possession of narcotics, or indeed of any other crime. He simply testified that the coin purse and the cigarette package found by the police in the car in which he and Riggiola were arrested did not belong to him." He, however, testified to more than the foregoing as shown by the testimony italicized above.

436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], could be used to impeach defendant's credibility, the defendant was charged with sales of heroin to an undercover officer on January 4 and January 6. On direct examination he denied the sale on January 4 and admitted making a sale of the contents of a bag to the officer on January 6, but claimed it was baking powder and part of a scheme to defraud the purchaser. On cross-examination he was asked whether he had made specified statements to the police that partially contradicted his direct testimony, and he responded that he could not remember virtually any of the questions and answers recited by the prosecutor. In the statement defendant told the police that on January 4 the officer had used the defendant as a middleman to buy heroin from a third person with money furnished by the officer and that on January 6 the defendant had again acted for the officer in buying bags of heroin from a third person for which the defendant received $12 and part of the heroin. The jury was instructed that the statements attributed to defendant by the prosecution could be considered only in passing on his credibility and not as evidence of guilt. The statements were admittedly inadmissible under *Miranda* v. *Arizona, supra,* 384 U.S. 436, as part of the prosecution's case in chief.

*Harris* v. *New York, supra,* 401 U.S. 222, in concluding that the statements were admissible for impeachment purposes, relied on *Walder* v. *United States,* 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354], a case in which the court held that the defendant's broad assertion on direct examination that he had never possessed any narcotics opened the door, solely for the purpose of attacking the defendant's credibility, to evidence of heroin unlawfully seized on a prior occasion. *Harris* recognized that ". . . Walder was impeached as to collateral matters included in his direct examination, whereas [the defendant] here was impeached as to testimony bearing more directly on the crimes charged," but *Harris* stated "We are not persuaded that there is a difference in principle that warrants a result different from that reached . . . in *Walder* . . . . The impeachment process here undoubtedly provided a valuable aid to the jury in assessing [the defendant's] credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.

". . . . . . . . . . . . . . . . . . . . . .

"The shield provided by *Miranda* cannot be perverted into a license to

use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.''

The rule in *Harris* v. *New York, supra,* 401 U.S. 222, is followed in California. (*People* v. *Hayes,* 19 Cal.App.3d 459, 468 [96 Cal.Rptr. 879]; *People* v. *Acosta,* 18 Cal.App.3d 895, 903-904 [96 Cal.Rptr. 234].) The mere fact that this case involves the products of an illegal search, whereas *Harris* involved a statement obtained without complying with the principles in *Miranda* v. *Arizona, supra,* 384 U.S. 436, does not distinguish this case from *Harris* (see *United States* v. *Warren,* 453 F.2d 738, 742 (cert. den. 406 U.S. 944 [32 L.Ed.2d 331, 92 S.Ct. 2040]), and the majority makes no claim to the contrary.

The majority, in attempting to distinguish this case from *Harris* v. *New York, supra,* 401 U.S. 222, states that "Here the defendant on direct examination offered no elaborate justification for his conduct, and the prior illegally obtained evidence was therefore not 'inconsistent' or 'conflicting' with that testimony. Defendant did not rely on the illegality of the impeaching evidence as a sword to commit perjury, . . ." However, as we have seen, the jury could well have found that the illegally obtained evidence was inconsistent with an inference arising from defendant's direct testimony. The shield provided by the exclusionary rule should not be perverted into a license to commit perjury by way of a defense or to give misleading testimony on direct examination from which inferences of false matters could well be made by the jury.

The fact that here the illegally obtained evidence *circumstantially* rebutted *an inference arising from defendant's direct testimony,* whereas in *Harris* the illegally obtained evidence *directly* rebutted *specific false statements on direct examination* also does not serve to distinguish this case from *Harris,* and the majority does not claim otherwise. Here, as in *Harris,* "The impeachment process . . . undoubtedly provided valuable aid to the jury in assessing [defendant's] credibility, and the benefits of this process should not be lost . . . because of the speculative possibility that impermissible police conduct will be encouraged thereby.''

I conclude that under *Harris* v. *New York, supra,* 401 U.S. 222, the prosecution was properly allowed to impeach defendant's credibility by the evidence in question.[2] Although the doctrine in *Agnello* v. *United*

---

[2]This is not a case where an involuntary statement was used for impeachment purposes (see *People* v. *Underwood,* 61 Cal.2d 113, 120-121 [37 Cal.Rptr. 313, 389 P.2d 937]), nor a case in which a prior conviction invalid under *Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733], was used to

*States,* 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4, 51 A.L.R. 409], that is set forth by the majority and certain language quoted by the majority from *Walder* v. *United States, supra,* 347 U.S. 62,[3] tend to support the majority's conclusion as to error, in my opinion that doctrine and language are no longer controlling in view of *Harris.*

Furthermore, even if it be assumed that the court erred in permitting the prosecutor to impeach defendant's credibility by the evidence in question, the error was harmless. (See *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Harrington* v. *California,* 395 U.S. 250, 252 et seq. [23 L.Ed.2d 284, 286-287, 89 S.Ct. 1726]; *People* v. *Coffey, supra,* 67 Cal.2d 204, 223-224.) There was strong evidence that defendant had at least joint possession of the restricted dangerous drugs and heroin. The restricted dangerous drugs were underneath the dashboard of the car that was driven by defendant and in which Mrs. Riggiola was riding as a passenger in the front seat, and the heroin was in balloons inside a coin purse lying on the car's front seat.[4] Officers also testified that they found packages of balloons in an attache case that defendant admitted was his,[5] and defendant admitted familiarity with "red devils." In addition Mrs. Riggiola told the arresting officers, inter alia, that the contents of the coin purse were defendant's, that she was a narcotics addict, and that he supplied her with narcotics. She reiterated her statements at the trial and further testified in part that she and defendant lived together during the week before her arrest and that he supplied her with heroin in return for money she made from prostitution.

blacken the defendant's character and thus damage his general credibility (see *Loper* v. *Beto,* 405 U.S. 473 [31 L.Ed.2d 374, 92 S.Ct. 1014]; *People* v. *Coffey,* 67 Cal.2d 204, 218-219 [60 Cal.Rptr. 457, 430 P.2d 15]). *Loper* distinguished the situation there presented from one where "the record of a prior conviction was used for the purpose of directly rebutting a specific false statement made from the witness stand. Cf. *Walker* v. *Follette,* 443 F.2d 167 and see *Harris* v. *New York,* 401 U.S. 222; *Walder* v. *United States,* 347 U.S. 62." (405 U.S. at p. 482, fn. 11 [31 L.Ed.2d at p. 381].)

[3]The language in *Walder* consists primarily of the statement that a defendant "must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." This language was emphasized by the dissent in *Harris,* but the majority in *Harris* apparently regarded the language as no longer of continuing validity.

[4]That the restricted dangerous drugs were in a cigarette box of a brand smoked by Mrs. Riggiola and that the coin purse was of a type an officer had seen women carry do not negate joint possession of the contraband by her and defendant.

[5]Although defendant testified that he had never previously seen the balloons and that they and numerous other items in the case were not there at the time of his arrest, this self-serving testimony was rebutted by the testimony of two officers that the contents of the case were exactly the same as when the case was opened at the time of the arrest.

The foregoing testimony of Mrs. Riggiola, together with the circumstantial evidence, also furnished a basis for finding defendant guilty of possession of heroin as her aider and abettor.[6] Defendant's testimony that he was unaware that she was a heroin user is simply beyond belief in view of uncontradicted evidence that he cohabitated with her for several days before his arrest, that needle marks were evident over the veins of one hand and scar tissue on the veins of her arms, and that she had had a fix shortly before her arrest.

The fact that Mrs. Riggiola's statement concerning defendant's supplying her with narcotics incriminated her as well as defendant tended to show its trustworthiness, and her statement was corroborated by the circumstantial evidence heretofore recited. The promises of leniency she stated had been made to her after discussions with representatives of the district attorney's office obviously did not affect the statements she had theretofore made to the arresting officers, which statements were in accord with her testimony at the trial. There is no reasonable possibility that the fact she may have been under the influence of narcotics at the time of her arrest[7] impaired her capacity to perceive, recall, and narrate the simple facts concerning whether she was a narcotics addict, who supplied her with narcotics, and who owned the contents of the coin purse.

In my opinion in view of the overwhelming evidence of defendant's guilt of the crimes charged, the prosecution has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (See *Chapman* v. *California, supra,* 386 U.S. 18, 24; *Harrington* v. *California, supra,* 395 U.S. 250, 252 et seq.; *People* v. *Coffey, supra,* 67 Cal.2d 204, 223-224.)

I would affirm the judgment.

Wright, C. J., and McComb, J., concurred.

---

[6]The jury was instructed regarding the above theory as well as the theory of joint possession.

[7]One arresting officer did not notice anything unusual about Mrs. Riggiola and did not know whether she was then under the influence of drugs. Another arresting officer, however, gave the testimony referred to by the majority indicating that she was then under the influence of drugs.