UNITED STATES of America, Appellee,

v.

Garle A. WHITSON, Appellant.

No. 77–2193.

United States Court of Appeals, Ninth Circuit.

June 22, 1978.

Rehearing and Rehearing En Banc Denied Dec. 15, 1978.

---

Fred L. Baker (argued), San Francisco, Cal., for appellant.

Robert E. Carey, Jr. (argued), San Francisco, Cal., for appellee.

Before KILKENNY and GOODWIN, Circuit Judges, and MURRAY *, District Judge.

* The Honorable William D. Murray, Senior United States District Judge for the District of Montana, sitting by designation.

GOODWIN, Circuit Judge:

Whitson was convicted of violating 26 U.S.C. § 5861(d), possession of an unregistered firearm (a destructive device), and 18 U.S.C. § 844(i), destruction of a vehicle used in interstate commerce. He appeals.

Whitson was due to appear in court in Los Angeles on Monday, September 16, 1974, on charges related to his amphetamine business.[1] Early that morning his van was blown up on a lonely road in the Big Sur area south of Monterey, California. The debris included expired credit cards and other items identified with Whitson.

Highway Patrol officers had stopped Whitson and his sister-in-law for speeding near Marina, California, a little over two hours before the explosion. Marina is about fifty miles and an hour's drive from the site of the explosion. At the time of the stop, Whitson was driving the van and his sister-in-law was following in another car.

The government's theory was that Whitson intended to create the illusion that he had died in the explosion to explain his planned absence from the Los Angeles prosecution. Whitson testified that he left his van in a restaurant parking lot, and learned of the explosion from news broadcasts. He said he then decided not to return to Los Angeles. Both sides agree that Whitson remained a fugitive until his capture in August 1976.

His sister-in-law's activities also inspired various explanations. The government theory was that she was to drive Whitson away from the planned explosion. Whitson said she had accompanied him to take back papers he expected to receive at a meeting with two men in Marina. She said her purpose was merely to enjoy another episode in their continuing romantic affair, but that she turned around and returned home soon after receiving the traffic ticket.

Whitson's possession of bombs and knowledge of their construction were relevant to the government's case. According to Sergeant Lawrence Gandsey of the Los Angeles County Sheriff's Department, Whitson had said during a search of his office in April 1973 that he had been "in ordnance" while he was in the army. Gandsey also said that he saw an army ordnance publication in Whitson's office. The trial court ordered this evidence suppressed on the theory that Whitson's interview violated his Miranda[2] right to silence. Without the challenged statements, the court thought that Gandsey's testimony about the army publication was too remote for admission. Whether or not that ruling was correct, the evidence was not admitted during the prosecution's case.

On direct examination, after the government had rested, Whitson answered his attorney's carefully limited questions. He denied destroying his truck or possessing a bomb or destructive device for the purpose of destroying his truck.

On cross-examination, the government, over defense objections[3] asked Whitson about his knowledge of explosives and about his encounter with Gandsey. Whitson denied any knowledge of explosives, denied telling Gandsey that he had been in the ordnance branch of the army, and denied possessing the army manual.[4] The government then put Gandsey on the stand

---

1. *United States v. Whitson,* was affirmed in most respects in an unpublished memorandum. 568 F.2d 780 (9th Cir. 1978).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. At the time the prosecutor first attempted to ask Whitson about his encounter with Gandsey, Whitson's counsel objected, primarily on relevance grounds; when the prosecutor cited *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), counsel agreed that *Harris* seemed to control. A strict view of waiver could militate against reaching this point. However, it does not seem realistic to expect counsel to come up with the direct/cross distinction on his feet at a time when there was no federal authority for it as it related to statements. On appeal he does make this argument.

4. The government also introduced in its case in chief, similar statements which Whitson made at his Los Angeles trial. He had also made those statements on cross-examination.

to impeach Whitson's cross-examination testimony. Gandsey gave his version of the encounter, which earlier had been excluded.

Whitson challenges the receipt of Gandsey's evidence on two grounds: (1) it impeached cross-examination that had gone beyond the scope of the direct examination; and (2) a *Miranda*-barred statement is not admissible to impeach defense testimony elicited only on cross-examination.

■■■ The first ground reveals no error. The extent of cross-examination is left largely to the trial court's discretion, and this court monitors that discretion with deference to the trial court's role in deciding what is relevant. *United States v. Hearst*, 563 F.2d 1331, 1340–41 (9th Cir. 1977); *United States v. Palmer*, 536 F.2d 1278 (9th Cir. 1976). After Whitson had denied possessing a bomb for the purpose of destroying his van, searching cross-examination on Whitson's general knowledge of explosives was no abuse of discretion.

A question of a different kind, however, arises from the government's impeachment strategy of setting Whitson up. The government asked Whitson about his statements to Gandsey knowing that Gandsey's contradictory testimony had been *Miranda*-barred.

■ To determine whether this particular impeachment was error, we look to the Supreme Court's discussion of impeachment by illegally obtained evidence and then examine our own and other courts' responses to the Supreme Court's teaching.[5]

We begin with the basic proposition that illegally obtained evidence may not be used in a criminal trial. *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). There are, of course, exceptions.

In *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the Court allowed the use of illegally seized evidence for impeachment. On direct examination, the defendant had denied any prior contact with the narcotics trade. The Court distinguished *Agnello* and held that, in opening the door on direct, Walder subjected himself to impeachment by evidence of an illegally seized heroin capsule. The Court emphasized that the defendant had made his statements of his own accord, and pointed out that in *Agnello* it was the government that had insinuated the impeachment foundation into the cross-examination. 347 U.S. at 66, 74 S.Ct. 354.

The distinction between affirmative and defensive use of the exclusionary rule was next considered in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The prosecution in *Harris* on cross-examination used *Miranda*-barred statements to contradict the defendant's direct testimony. The Supreme Court affirmed on the basis of *Walder*. The deterrent effect of the *Miranda* rules on police practices would not be significantly affected, the Supreme Court said, by the *Walder* use of noncomplying statements, and defendants would not be encouraged to resort to perjury affirmatively as a defense. In *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), the government also used the *Miranda*-barred statements to impeach a defendant's affirmative presentation made on direct examination.

This court in *United States v. Trejo*, 501 F.2d 138, 143–46 (9th Cir. 1974), considered the impact of *Agnello, Walder,* and *Harris* on the use of illegally seized evidence to impeach a defendant's statements when offered on cross-examination. Relying on the decision of the California Supreme Court in *People v. Taylor*, 8 Cal.3d 174, 104 Cal.Rptr. 350, 501 P.2d 918 (1972), we said that

---

**5.** Some cases deal with the use of illegally obtained physical evidence, others with illegally obtained statements. While different constitutional considerations are at work both these situations are governed by the same standards. If a substantive difference is called for, the standards for admitting illegally obtained statements should be more strict because of the trustworthiness implications of the Fifth Amendment as distinguished from the security implications of the Fourth Amendment. *See Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

impeachment by illegally seized evidence was error, although in the circumstances of the *Trejo* case it did not require reversal. We thought that the distinction in *Walder* between the defendant's statements on direct and on cross survived *Harris*. As we quoted the California court:

" * * * [T]he defendant on direct examination offered no elaborate justification of his conduct, and the prior illegally obtained evidence was therefore not 'inconsistent' or 'conflicting' with that testimony. Defendant did not rely on the illegality of the impeaching evidence as a sword to commit perjury, but simply as a shield against the consequences of concededly improper police practices." *United ed States v. Trejo*, 501 F.2d at 145, *quoting People v. Taylor*, 8 Cal.3d at 185, 501 P.2d at 925, 104 Cal.Rptr. at 357.

■ The *Trejo* reasoning applies here. Whitson on direct examination simply denied destroying his van or possessing a bomb for that purpose. He did not raise an issue of his knowledge about explosives. It was, therefore, inconsistent with *Trejo* to allow the government to question him about, or to present extrinsic evidence of, his earlier *Miranda*-barred statements to Gandsey. The *Trejo* problem was compounded when the government argued the impeaching evidence to the jury as substantive evidence of Whitson's knowledge rather than simply using it for its ostensible purpose of attacking his testimonial credibility. However, Whitson did not object to this line of argument, nor does he raise the issue on appeal. Indeed, his attorney followed the prosecutor's cue and also argued the substantive weight of the evidence to the jury. We assume that counsel made a tactical decision to make the best of a bad situation. Counsel may have thought it unlikely that the jury would in fact limit its use of the evidence to impeachment. The jury had the evidence before it, and some juries are not overly sympathetic to legal technicalities. In these circumstances, there was no "plain error" in the prosecution's argument.

The weight of authority from other jurisdictions teaches that it is error to permit the prosecution to use illegally obtained evidence for impeachment on a matter not opened by the defendant. New York, which created the *Harris* rule when most federal and state courts refused to allow any use of *Miranda*-barred statements for impeachment, requires that the defendant open the door to the impeaching evidence by testifying to the point on direct. The prosecutor may not range beyond the direct examination in order to lay a foundation for the tainted evidence as rebuttal. *People v. Rahming*, 26 N.Y.2d 411, 311 N.Y.S.2d 292, 259 N.E.2d 727 (1970).

A recent and thorough discussion of this problem is found in *State v. Kida*, 375 A.2d 1105 (Md.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977). The Maryland court limited the use of *Miranda*-barred statements to impeaching a defendant's "specific credibility arising from a realistic contradiction between the issues he initiated on direct examination and the impeaching statement." 375 A.2d at 1115.

Commentators take a similar position. 3 J. Weinstein and M. Berger, Evidence ¶ 607(09), at 607–89 to 607–90; Comment, *The Impeachment Exception to the Constitutional Exclusionary Rule*, 73 Colum.L. Rev. 1476, 1484–85 (1973). The Second Circuit treats illegally obtained evidence in the same way we did in *Trejo*. *United States v. Mariani*, 539 F.2d 915 (2d Cir. 1976).

■ When the defendant presents his or her case on direct without raising issues that are open to impeachment, and the government cross-examines to elicit impeachable statements, the government must be prepared to use legitimate evidence.[6] It is error to permit the govern-

---

**6.** The trial court should exercise its discretion in controlling the scope of cross-examination carefully in a case where the prosecution can support the inferences raised only by reference to inadmissible evidence. If the impeaching evidence cannot be introduced because it was illegally obtained, trial courts should be careful not to permit damaging inferences to be raised during cross-examination. When the prosecution begins to cross-examine into questionable

ment to proceed to impeach its own induced statements with inadmissible evidence.

All the government accomplishes by the tactic is an attack on the credibility of something the defendant would not have said but for the government's asking. At best, the prosecution will have introduced no evidence at all (if the jury decides not to believe the impeached statement). At worst, the prosecution will have produced evidence harmful to the government (if the jury decides to believe the defendant's testimony despite the impeachment).

■ In no case is it permissible for the jury to use the impeaching evidence in deciding the defendant's guilt or innocence, as government counsel incorrectly urged it to do here. Logically, therefore, the strategem is of questionable relevance to the trial, and the government has advanced no good reason to permit it in the face of strong reasons against it. *See United States v. Ragghianti*, 560 F.2d 1376, 1381 (9th Cir. 1977).

■ The admission of the evidence concerning Whitson's statements to Gandsey was error. The error was of constitutional dimensions, so it requires reversal unless we can say that it was harmless beyond a reasonable doubt. We cannot do so here. *United States v. Lemon*, 550 F.2d 467, 471 (9th Cir. 1977), *United States v. Bekowies*, 432 F.2d 8, 14 n.8 (9th Cir. 1970).

While the error was not harmless, it was also unnecessary. In light of the government's other evidence and Whitson's own story, the jury had little choice but to believe that Whitson had blown up his van. The error was the kind of mindless overkill into which prosecutors sometimes blunder.

■ Whitson's other contentions raise a question that may recur on another trial. The trial court admitted evidence of a bomb found at Whitson's business a year before the van blew up. Other persons had access to the place where the bomb was found. Except for the location, there was no other direct connection with Whitson. There was

some evidence that the bomb which destroyed the van may have been similar to the earlier bomb. The court overruled an objection on the ground of irrelevance to evidence of the earlier bomb. The court did not abuse its discretion. The weakness or strength of the evidence was a matter for the jury's consideration.

Because of the error in receiving the *Miranda*-barred evidence to impeach testimony brought out by the government only, we must reverse the judgment.

Reversed and remanded.

KILKENNY, Circuit Judge, concurring and dissenting:

I fully agree with the majority's conclusion that: "After Whitson had denied possessing a bomb for the purpose of destroying his van, *searching cross-examination* on Whitson's general knowledge of explosives was no abuse of discretion." On the other hand, I strongly disagree with the majority's conclusion that appellant's sworn denials on cross-examination did not open the door to the alleged *Miranda*-barred statements to the police officer. It is wholly illogical to hold that a defendant may not hide beyond the shield of the *Miranda* rule if he perjures himself on direct examination, but may invoke the protection of *Miranda* if he perjures himself on the same subject matter on cross-examination.

### DISCUSSION

On cross-examination appellant swore that he didn't know anything about a bomb or explosives and had never read anything about explosives or bombs or the handling of such. Moreover, he swore that he did not have in his possession in April, 1973, a book which dealt with ordnance and explosives. The government then called a police officer who testified that in April, 1973, he entered the appellant's office with a search warrant and there observed and discussed with appellant an Army Ordnance Manual which dealt with the construction and the

areas, the trial court should immediately determine what evidence can support the inquiry. If

the only available evidence is inadmissible, the court should not permit the cross-examination.

disarming of explosive devices. The officer testified that appellant told him that he had been connected with ordnance while in the service. Additionally the officer had asked appellant if he had been connected with ordnance and the appellant answered yes while holding the manual in his hand.

The majority's reliance upon *United States v. Trejo*, 501 F.2d 138 (CA9 1974) is misplaced. First of all, the *Trejo* analysis of the leading case of *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), is dicta and is not controlling as a precedent. After a detailed discussion of the problem, the *Trejo* court concluded that the error, if any, was harmless and affirmed the judgment of conviction. In my special concurring opinion in *Trejo*, I criticized the limitations suggested by the majority on the breadth of the *Harris* decision on the record which we then had before us. I am aware of no authority which would require us to accept dicta as the law of this circuit. The *Trejo* court's conclusion that defendant's failure to object waived any claim of error to the cross-examination brands its discussion and limitation of *Harris* as pure dicta.

That the *Trejo* court had no logical ground on which to proceed to a discussion of the principles enunciated in *Harris* is made clear by the concluding language of its opinion:

> "The record, when considered in its entirety, discloses that the appellant received a full and fair trial, and that the verdict is amply supported by the evidence. *No objection was raised as to admission of the gun or briefcase, and the jury evidently rejected it when it declined to convict appellant of the crime of armed robbery, choosing instead to convict him of the lesser included offense of robbery without a dangerous weapon.* Appellant was permitted to explain the presence of the gun and briefcase in his home, and the jury evidently accepted that explanation." 501 F.2d at 145–46. [Emphasis supplied].

If, as stated by the court, the jury rejected the issue raised by the admission of the gun and briefcase in evidence, there was no reason for the court to pass on the admissibility of such items in evidence or to say that the admissions were erroneous. *Trejo*, if it means anything, stands for the proposition that a judgment of conviction must be affirmed when a defendant has had a fair and impartial trial. Certainly, its analysis of the meaning of *Harris* should not be considered as authoritative.

Inasmuch as appellant concedes that the cross-examination was proper and within the scope of the direct, he cannot claim that the government by its cross merely "set him up" for the purpose of impeachment.

I believe *Harris, supra*, and its progeny control. *Harris* makes it crystal clear that the *Miranda* doctrine prohibiting the use of certain evidence against an accused in the prosecution's case in chief is not barred for all purposes, providing that the trustworthiness of the evidence satisfies legal standards. Here, there is no challenge to the trustworthiness of the impeaching evidence. *Harris* also reaffirms that the exclusionary rule proscribing police conduct in *Miranda* type cases was invoked for the purpose of deterring future conduct of the same type. That sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief is made clear in *Harris*.

Of particular application to the facts before us is the following statement from *Harris*.

> "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See *United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); cf. *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). *Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.*[2] Had inconsistent statements been made by the accused to some third person, it could

hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

"*The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.*" 401 U.S. at 225–26, 91 S.Ct. at 645–46.

Footnote 2 which is part and parcel of the above quotation casts additional light on the breadth of the Court's holding. It is there said:

"2. If, for example, an accused confessed fully to a homicide and led the police to the body of the victim under circumstances making his confession inadmissible, the petitioner would have us allow that accused to take the stand and blandly deny every fact disclosed to the police or discovered as a 'fruit' of his confession, free from confrontation with his prior statements and acts. *The voluntariness of the confession would, on this thesis, be totally irrelevant. We reject such an extravagant extension of the Constitution.*" 401 U.S. at 225, 91 S.Ct. at 646. [Emphasis supplied].

Here, as in *Harris*, the appellant makes no claim that the *Miranda* statements were in any way coerced or involuntary. For that matter, the contrary is made clear by the record. The statements were made in appellant's own home, in casual conversation. About 8:00 P.M. on the evening in question, five police officers arrived at appellant's house where he was questioned by the officers. He was instructed as to his rights and then refused to discuss the case. About two hours later Officer Gandsey conducted his search of Whitson's residence pursuant to a search warrant. It was while making this search that the officer found the ordnance manual on explosives and asked the questions of appellant with reference to his experience with bombs. It is to be noted that the appellant was in his own home and was not in custody. In these circumstances, the trustworthiness of the evidence satisfies all legal standards. Moreover, although the issue is not before us, I would seriously

question the lower court's suppressing the statements in the first instance.

The later Supreme Court case of *Oregon v. Hass*, 420 U.S. 714, 722–723, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), fully supports *Harris* by holding that one central factor to be considered in admitting the *Miranda*-barred statement is whether coercive tactics were used. There, the Court said:

"As in *Harris*, it does not follow from *Miranda* that evidence inadmissible against Hass in the prosecution's case in chief is barred for all purposes, always provided that 'the trustworthiness of the evidence satisfies legal standards.' 401 U.S., at 224, 91 S.Ct. at 645. Again, the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, 'the benefits of this process should not be lost,' *id.*, at 225, 91 S.Ct. at 645; and, again, making the deterrent-effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief. If all this sufficed for the result in *Harris*, it supports and demands a like result in Hass' case. *Here, too, the shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances.*" 420 U.S. at 722, 95 S.Ct. at 1221. [Emphasis supplied].

In *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), the Supreme Court aptly outlines a defendant's position after he has exercised his choice to take the witness stand, in the following language:

"He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. '[T]here is hardly justification for letting the defendant affirma-

tively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.' *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503." 356 U.S. at 155–56, 78 S.Ct. at 627.

I am in complete disagreement with what is said in footnote 6, page 525, of the majority's opinion. This language places an unconscionable burden on the shoulders of a trial judge. The uniform rule is that if a defendant takes the witness stand and testifies on a particular subject, he turns the searchlight of a wide cross-examination on the truthfulness of his testimony, the subject matter of his direct examination.

## CONCLUSION

Inasmuch as appellant, under *Harris*, waived his rights against self-incrimination, he should not be permitted to perjure himself on cross-examination on the subject matter of his direct testimony and circumvent the truth by hiding behind the *Miranda* rule. I would affirm the judgment of conviction.