[Crim. No. 11962. Fourth Dist., Div. One. Jan. 19, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN GABINO FLORES et al., Defendants and Appellants.

514

**COUNSEL**

Bryan C. Hartnell and Frank L. Croteau, under appointments by the Court of Appeal, and Lawson & Hartnell for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**COLOGNE, J.**—A jury found Benjamin Gabino Flores and Jacinto Dominguez guilty of selling heroin (Health & Saf. Code, § 11352), involving four counts in Flores' case and one count in Dominguez' case, and possessing heroin for sale (Health & Saf. Code, § 11351), involving one count in each case. On the heroin sale count (count IV) and the possession for sale count (count V) involving both Flores and Dominguez, the jury found true the allegation the substance was in an amount of one-half ounce or more within the meaning of Penal Code section 1203.07, subdivision (a)(2). The trial court sentenced Flores to prison for the upper term of five years on the sale count involving both Flores and Dominguez (count IV), to a consecutive one-year term on the possession for sale count also involving both individuals (count V), and to concurrent middle terms of four years each on the remaining three sales convictions. It sentenced Dominguez similarly on counts IV and V, though it used the middle term of four years on the sale count, and it added a one-year consecutive term for a prior felony conviction Dominguez admitted before trial.

In August 1979, narcotics task force Deputy Sheriff Frank Peralta contacted Celeste Harrison, also known as Lelani Moore, at the Las

Colinas county jail facility. Moore, a prostitute and addict, was awaiting trial of charges of prostitution and drug use. The deputy and she arranged for her to become a paid drug informant with the deputy promising to pay her $400 to $600, provide some of her housing, buy a ticket out of town for her, and tell the city attorney involved with charges pending against her about her cooperation and willingness to testify. Peralta and she discussed Flores whom Moore knew.

On September 6, 1979, after she was released from jail, Peralta arranged for Moore to be taken to Flores' San Diego residence where she carried out a "controlled" purchase of one balloon of heroin from Flores. The "control" involved search of Moore's person, except body cavities, and her effects, as well as furnishing her with $100 in $20 bills with the serial numbers recorded before she made contact with Flores, then searching her after the purchase so as to determine she had none of the money and no more heroin on her person after the purchase. Officers kept her in sight during the whole transaction except the actual sale and purchase inside Flores' house.

Moore made a similar controlled purchase at Flores' place on each of the next two days, resulting in Flores selling her two balloons of heroin for $200 on September 7, and a plastic baggie of $450 worth of heroin on September 8.

In the afternoon following the September 7 sale, Peralta executed his affidavit for a search warrant which said he had received confidential information regarding Flores and his place within the past three days from a reliable informant. Among other things not here pertinent, the affidavit also stated: "This Affiant, with in the last 3 days, had Agent DEBBIE MILLER search daid [sic] informent [sic] and determined that the informant was not in the possession of any contraband or money. That the confidential informant was then provided with $100.00 of grant funds and then driven to the area of 3711 Clavelita St., in the City of San Diego, County of San Diego, State of California by Police Officer M. L. Davis of San Diego Police Department Crime Suppression Unit. Agent Peralta and Officer E. Newberg of San Diego Police Department Crime Suppresion [sic] Unit observed the confidential informant walk to the 3711 Clavelita St. address and contact 'S' BENJAMIN FLORES in the front yard of the resident after a short conversation both the confidential informant and 'S' BENJAMIN FLORES were observed entering the above address. Agent Peralta and Officer Newberg observed 'S' Benjamin Flores exit the residence and walk towards

the front portion of the residence and returned back inside the residence. Shortly after that the confidential informant and 'S' Benjamin Flores exited the residence. The confidential informant returned to San Diego Police Officer Davis and handed Officer Davis a YELLOW ROLLED BALLOON with herion [*sic*] that had been purchased in the residence of 3711 Clavelita St., San Diego, California from Benjamin Flores. Police Officer Davis and the confidential informant met with Agent Miller at which time Agent Miller searched the informant and found no money or contraband on the confidential informant. Said informant told this Affiant that while inside the premises the purchase was made from Benjamin Flores, and said informant in exchange for $100.00 of grant funds received a yellow rolled balloon of heroin, approximately 1 gram. The Affiant conducted a field presumptive test which proved positive for herion [*sic*].

"Said informant stated to this Affiant that said informant has seen substances recognized by the informant to be narcotics on numerous prior occassions [*sic*] when the informant has been in the residence at 3711 Clavelita St., San Diego, California. The informant has personally seen ounce quantities of substances known to her to be heroin and identified to the informant by Benjamin Flores to be heroin."

Armed with search and arrest warrants for both the Flores place and Flores, the officers and Moore returned there on September 11 for another controlled purchase. This time they gave Moore $4,000 in chemically dusted bills with recorded serial numbers for use in the purchase. Moore went into the house and bought over two ounces of heroin from Dominguez and Flores, both of whom handled the money as later determined from ultraviolet testing. While Moore was in the house, Dominguez left by a rear door, walked part way down a nearby hillside and put the money under a piece of cement. During this time, Dominguez twice went to a pile of lumber outside the house where two baggies of heroin were later found. Meanwhile, Flores escorted Moore to the police-manned taxicab she had arrived in and when he was told by the driver the police were there, Flores ran back toward the house. At the same time, task force officers converged on the scene. Officer Peralta saw Flores running back to the house, yelled at him to stop and placed him under arrest, handing his custody over to another officer. Peralta immediately went to the front door of Flores' house, saw the screen door was ajar and the front door open and yelled "Police officer with a search warrant. Demand an entry." Knowing of the heroin sales in the house, realizing someone else was inside and thinking any more heroin

in there could be destroyed, Peralta entered one or two seconds later and saw Dominguez and a woman sitting on a couch in the living room. Dominguez was placed in custody and Flores was brought in and served with the warrant. The search which followed turned up two scales and various other items used in the heroin packaging process, a small caliber handgun and documents showing Flores resided there. Also seized were the heroin and money from their respective hiding places outside Flores' house.

Flores and Dominguez contend the search warrant was invalid because material facts were omitted. Omitted facts they argue should have been included tended to show Moore was not a reliable informant and was under pressure to please the police to receive rewards offered for her cooperation. These alleged facts included her being addicted to heroin with a heavy use, her worry about being committed to the California Rehabilitation Center in connection with the pending charges; police promises to aid her in resolving those charges, to pay her $600 and to furnish a ticket to leave the area; and payments police had made for a motel room and spending money for Moore.

A search warrant affidavit need only furnish the magistrate with information, favorable and adverse, sufficient to permit a reasonable, common sense determination whether circumstances which justify a search are probably present (*People* v. *Kurland* (1980) 28 Cal.3d 376, 384 [168 Cal.Rptr. 667, 618 P.2d 213]). The affiant's duty of disclosure extends only to "material" adverse facts, and materiality is tested by determining whether the omission makes the affidavit substantially misleading, that is, whether because of the inherent probative force of the omitted facts there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination (*id.*, at pp. 384, 385).

Granting for the moment the omissions were material to the issue of Moore's reliability, i.e., that she was credible or her information reliable (*Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]), we must embark on the concluding steps of analysis set forth in *Kurland* as follows: "If an omission is found material, the reviewing court must next determine, as in *Theodor* and *Cook*, whether it arose innocently or from culpable conduct. However, since not all intentional omissions of material facts are blameworthy, the reviewing court must apply a modified version of the *Theodor-Cook* formula for culpability. The necessary modification is plain. The trial court must decide

whether the material omission was either (1) reasonable, (2) negligent, or (3) *recklessly inaccurate or intentionally misleading.* That the omission itself was 'intentional' rather than inadvertent may be relevant to those issues, but may not alone be dispositive.

"A material omission is reasonable when despite the exercise of due care, affiant was ignorant of the omitted fact or forgot to include it, or his conclusion that it was privileged or immaterial was reasonable even if incorrect. Where material omissions are reasonable, whether volitional or inadvertent, no sanction should be imposed; the situation corresponds to that of reasonable misstatements. Because affiant will, in such cases, have done all that can reasonably be expected to comply with constitutional standards, little deterrent purpose would be served by further review of the affidavit. (*Theodor, supra,* 8 Cal.3d at pp. 97-100 [104 Cal.Rptr. 226, 501 P.2d 234].)

"Negligent omissions of material fact occur when the affiant is unreasonably ignorant of facts, unreasonably forgets to include them, or makes a good faith but unreasonable decision that they need not or should not be included. In such cases the 'add and retest' formula developed in *Barger, Morris,* and *Neusom* is proper. It discourages carelessness and helps eliminate the likelihood that a negligent mistake may cause an erroneous finding of probable cause. Yet it recognizes the affiant's good faith effort at accuracy. (*Cook, supra,* 22 Cal.3d at pp. 84-85 [148 Cal.Rptr. 605, 583 P.2d 130].)" (*People* v. *Kurland, supra,* 28 Cal.3d 376, 387-388.)

Viewing the omissions alternately as intentional or negligent and applying the respective tests of reasonableness or "add and retest," we have concluded the challenge to the affidavit cannot succeed. This is because, by virtue of the carefully controlled purchase situation and particularly the searches of Moore both before and after the sale, her observed meeting with Flores in his front yard as well as the positive testing of the substance she turned over to Peralta immediately afterward, there was unimpeachable factual corroboration of the information Moore provided. Thus it was reasonable for the officer to omit the cited information relating to Moore's reliability and, even if those matters had been included in the affidavit, the strong corroborative effect of the controlled purchase overcomes any negative influence the cited information could have upon the magistrate's determination of the informant's reliability and probable cause (see *People* v. *Neusom* (1978) 76 Cal.App.3d 534, 539-541 [143 Cal.Rptr. 27]).

■ Flores and Dominguez contend the officers entered the Flores residence unlawfully because they did not give the persons present a reasonable opportunity to permit or refuse peaceable entry (Pen. Code, § 1531).

■ While an entry by police without giving the occupants a reasonable opportunity to permit or refuse a peaceable entry may not reasonably be considered substantial compliance with section 1531 (*Brown* v. *Superior Court* (1973) 34 Cal.App.3d 539, 543 [110 Cal.Rptr. 107]), strict compliance with demand and notice requirements of that section (as well as Pen. Code, § 844) may be excused "'if the specific facts known to the officer before his entry are sufficient to support his good faith belief that compliance will increase his peril, frustrate the arrest, or permit the destruction of evidence.'" (*People* v. *Dumas* (1973) 9 Cal.3d 871, 877 [109 Cal.Rptr. 304, 512 P.2d 1208].) Strict compliance is more readily excused where the police in good faith believe their presence and purpose to enter is already known to the occupants (*People* v. *Rosales* (1968) 68 Cal.2d 299, 302 [66 Cal.Rptr. 1, 437 P.2d 489]; *Brown* v. *Superior Court, supra,* 34 Cal.App.3d 539, 543).

■ Here, the specific facts known to Peralta included the immediately preceding large heroin sale actively engaged in by Dominguez whom he knew was inside the same house where heroin sales of increasing amounts were completed in four of the past six days and, as the trial court emphasized, the yelling at Flores just outside the open front door which he reasonably could consider as having warned those inside of the officers' presence and purpose. Under these circumstances, there is an excuse for not strictly complying with the knock and notice requirement in terms of waiting a time after the officer's presence and purpose was announced (see *Brown* v. *Superior Court, supra,* 34 Cal. App.3d 539, 543-544).

■ Flores contends the trial court committed reversible error by permitting the prosecutor to ask him on cross-examination about a heroin sale he engaged in two years earlier in which the criminal case was dismissed after a suppression motion was granted. On direct examination, Flores' counsel displayed the narcotics exhibits and asked:

"Q. With respect to any of these items, did you ever possess or sell any of those to—

"A. No.

"Q. —Lelani Moore?

"A. No." This was the extent of the direct examination.

During cross-examination, the prosecutor similarly asked Flores if he "ever" sold narcotics to Moore, and he replied "No, sir, to her or anybody else."

After this questioning and an in-chambers hearing on the admissibility of the two-year-old evidence found to have been unlawfully seized, the trial court ruled Flores could be asked about the old evidence for purposes of impeachment and the jury would be instructed to that effect. It also ruled other evidence of the two-year-old transaction would be admitted if Flores denied he has possessed heroin for sale previously. In later questioning by the prosecutor, Flores admitted he had possessed heroin for sale two years earlier.[1]

*People* v. *Taylor* (1972) 8 Cal.3d 174 [104 Cal.Rptr. 350, 501 P.2d 918], instructs at page 182: "[I]n narcotics cases evidence of prior possession of contraband by the defendant that was obtained by means of an illegal search and seizure is admissible for the limited purpose of impeaching the defendant as a witness only if, on his direct examination, he makes a sweeping claim that he has never dealt in or possessed any narcotics; the evidence is not admissible for any purpose if the defendant merely denies committing the crime charged and it is the prosecutor who, on cross-examination, elicits an expected denial of his equally sweeping question asking if the defendant has ever engaged in narcotics activity before."

---

[1]The actual questioning allowed by the court went as follows:
"Q. Mr. Flores, yesterday in response to one of the questions that was asked of you by myself, you had indicated that you had not sold any heroin to Miss Lelani Moore. [¶] Do you recall making that statement, sir?
"A. Yes, sir.
"Q. Then, in addition, you also indicated that you had never sold heroin to anyone else. [¶] Do you recall making that statement, sir?
"A. Yes, sir.
"Q. Now, Mr. Flores, have you ever possessed heroin for sale?
"A. Yes, sir.
"Q. And when was that?
"A. Two years ago.
"MR. RUDLOFF: Thank you. I have no further questions."

The sole question then is whether Flores "opened the door" by making a denial sweeping enough to permit the further cross-examination on the matter by the prosecutor. We have concluded, as did the trial court, that Flores opened the door to this form of impeachment by voluntarily saying he never sold to anybody else. He did not need to say this in order to answer the prosecutor's question. The prosecutor did not elicit an expected denial, as is disapproved of in *Taylor*. Rather, the prosecutor asked only about the sale to Moore and Flores attempted to convey an impression of cleanliness in terms of narcotics sales beyond what was called for by the question. As did the trial court, we do not think a defendant should be permitted to continue to project such an impression if it is false.

Impeachment by showing falsity in the volunteered disclaimer of ever having sold heroin to anyone was proper under these circumstances. The problem here, however, is the prosecutor's later eliciting of evidence in the form of Flores' admission he previously *possessed heroin for sale* did not tend in reason to prove or disprove whether Flores testified truthfully when he denied having ever *sold heroin* to anyone. Proof of possession for sale, without more, does not prove a sale; it does not serve to impeach credibility by showing falsity in the disclaimer of ever having sold. The testimony was not relevant to Flores' credibility (Evid. Code, § 210) and for that reason should not have been admitted.

The error in admitting this proof does not require reversal in light of overwhelming evidence against him in the form of the several carefully controlled purchases by Moore whose changed testimony at trial was shown clearly to be false by her own preliminary hearing testimony. No miscarriage of justice occurred here (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

■ Dominguez contends the trial court erred in not instructing the jury *sua sponte* that Moore was or could be considered an accomplice whose testimony requires corroboration under Penal Code section 1111.

The case law of this state has firmly established that as a matter of law one who feigns complicity in the commission of a crime for the purpose of detecting and prosecuting the perpetrator is not an accomplice, and this rule applies fully to informants acting under police authority as Moore did in this case (*People v. Salazar* (1962) 201 Cal.App.2d 284, 287, 288 [20 Cal.Rptr. 25] (cited with apparent approval in *People v.*

*Hoover* (1974) 12 Cal.3d 875, 881 [117 Cal.Rptr. 672, 528 P.2d 760])). Dominguez' contention thus fails.

■ Dominguez next contends the trial court erroneously excluded evidence by a defense witness concerning past statements by Moore which were consistent with her trial testimony. Moore's testimony at trial exonerated Dominguez in direct contradiction of her preliminary examination testimony which she said was a lie. The prosecutor, of course, brought out the preliminary examination testimony. Dominguez then sought to introduce evidence of a statement Moore made to a witness Flores took her to see after the preliminary examination and two months before trial to the effect Moore's testimony at the preliminary examination was a lie. This evidence was offered to impeach Moore's preliminary examination testimony and to rehabilitate her trial testimony in light of the aura of recent fabrication then present.

The trial court ruled Moore had already impeached her preliminary examination testimony by testifying it was a lie and the proffered evidence came within no other exception to the hearsay rule, particularly in light of its timing.

We hold the trial court ruled correctly, for under Evidence Code section 791, subdivision (b), on which Dominguez relies, evidence of a past consistent statement is inadmissible unless it is offered after: "An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

The statement proffered here was not made before the bias, motive for fabrication or other improper motive arose. It thus was inadmissible under Evidence Code section 791, and the trial court's ruling was correct.

■ Dominguez next contends the trial court erred in instructing the jury on the prosecution's theory of aiding and abetting by using the standard CALJIC No. 3.01 without modifying it pursuant to Penal Code section 31 to specify intent to facilitate the commission of the offense is required. CALJIC No. 3.01, as given, reads: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [Mere pres-

ence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting.]" (1979 revision.)

As is said in *People* v. *Ott* (1978) 84 Cal.App.3d 118 at page 130 [148 Cal.Rptr. 479], "aiding in the commission of the crime with knowledge of the wrongful purpose of the perpetrator *eo ipso* establishes the criminal intent ... *'the criminal intent of the aider and abettor is presumed from his actions with knowledge of the actor's wrongful purpose'* (italics added)" (quoting from *People* v. *Ellhamer* (1962) 199 Cal.App.2d 777, 782 [18 Cal.Rptr. 905]). We might add to these truths the observation that since our system of justice entrusts to jurors the vast power of drawing any inference that can reasonably be drawn from substantial evidence and we forever bind ourselves to those inferences properly drawn, it would be demeaning of jurors' intelligence to instruct them, in addition, on the clear implication of intent that flows logically and necessarily from the words of the CALJIC No. 3.01 standard instruction. The standard CALJIC No. 3.01 is all that is required.

In *People* v. *Yarber* (1979) 90 Cal.App.3d 895, at page 916 [153 Cal.Rptr. 875], the following view is expressed: "The *Ellhamer/Ott* synthesis that intent is inferred from the knowledge by the aider and abettor of the perpetrator's purpose is sound, generally, as a matter of human experience, but we cannot extrapolate therefrom, as a matter of law, that the inference *must* be drawn. Intent is what must be *proved*; from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred.* In the absence of evidence to the contrary, the intent may be regarded as established. But where a contrary inference is reasonable—where there is room for doubt that a person intended to aid a perpetrator—his knowledge of the perpetrator's purpose will not suffice. [Fn. omitted.]

"The jury in the present case should have been instructed that a person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator, he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime. [Fn. omitted.]"

For the reasons stated, we cannot follow this view since we cannot accept its unstated premise that one who actually *aids* the perpetrator with the requisite knowledge might not *intend* to aid, again with the requisite knowledge. To make its analysis, we note, *Yarber* substitutes

"*action* with knowledge" (italics added) for the language of the instruction which requires not a finding of "action" with knowledge only, but rather a finding of aiding and abetting, again with the requisite knowledge.

Since *Yarber* says "[i]n the absence of evidence to the contrary, his intent to aid the perpetrator can be *inferred*" from a person's action with the requisite knowledge, the case can be viewed as requiring evidence showing the person accused as an aider and abettor did not intend to aid and abet the perpetrator as a prerequisite to its holding requiring the insertion of the word "intentionally" into CALJIC No. 3.01. No such evidence to the contrary exists here. Thus, it can be said the instruction given here fulfilled the requirements of *Yarber* (see *People v. Brown* (1981) 116 Cal.App.3d 820, 825-827 [172 Cal.Rptr. 221]).

■ Dominguez contends too the trial court erred in failing to instruct *sua sponte* in the manner of CALJIC No. 2.50 limiting the use of evidence of other crimes which came before the jury.

In the recent case of *People v. Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534], the Supreme Court reaffirmed the rule long shared by a majority of California's appellate courts that the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct (*id.*, at p. 64; see also *People v. Morrisson* (1979) 92 Cal.App.3d 787, 790-791 [155 Cal.Rptr. 152]). In the process, *Collie* expressly disapproved *People v. Williams* (1970) 11 Cal.App.3d 970 [90 Cal.Rptr. 292], which is the sole authority Dominguez cites on the point. It follows that Dominguez' contention in this regard fails.

■ Finally, Dominguez contends his consecutive sentence for possessing heroin for sale violates Penal Code section 654. He bases this assertion on the bare conclusion it was never shown that the heroin possessed for sale, i.e., that which remained in the lumber, was not the same heroin used in the sale at the very time.

The latter conclusion is not supported, for the inferences to be made from the evidence are that Moore turned over the heroin she purchased to Officer Debra Miller. This heroin was exhibit 13 in the trial.

The heroin later found in the lumber pile which Dominguez visited during the sale transaction was kept there for another purpose. This

heroin was exhibit 15 and was seized by Officer Larry Storks. The jury was correctly instructed as to these separate offenses and the evidence clearly supports them.

Accordingly, the separate offenses, each imbued with an independent intent and objective, support the consecutive sentencing as not violating Penal Code section 654 (*In re Adams* (1975) 14 Cal.3d 629, 633 [122 Cal.Rptr. 73, 536 P.2d 473]; *People* v. *Fortier* (1970) 10 Cal.App.3d 760, 765 [89 Cal.Rptr. 210]).

Judgments affirmed.

Brown (Gerald), P. J., and Work, J., concurred.

The petition of appellant Dominguez for a hearing by the Supreme Court was denied April 7, 1982.