[No. B025361. Second Dist., Div. Three. May 31, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DARRYL MOORE, Defendant and Appellant.

878

## COUNSEL

Ronald S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DANIELSON, J.—Michael Darryl Moore (defendant) appeals from a judgment of conviction following a jury trial at which he was found guilty of robbery (Pen. Code, § 211)[1] as charged in a one count information. The jury also found to be true the allegations that defendant was armed with a firearm during the commission of that offense (§ 12022, subd. (a)) and had taken funds and property of a value exceeding $100,000 (§§ 12022.6, subd. (b), and 1203.045, subd. (a)). Prior to trial defendant's motion to suppress (§ 1538.5) a written note as evidence was granted. After defendant's direct testimony, during his cross-examination, at trial, the court granted the People's motion to admit the suppressed evidence for the purpose of impeachment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

FACTUAL STATEMENT

A part of our decision is based on our holding that in the light of all of the evidence it does not appear reasonably probable that a result more favorable to the defendant would have been reached in the absence of error. Therefore we summarize the evidence in substantial detail.

On October 24, 1984, over $335,000 worth of jewelry was taken during a robbery of Gordon's Jewelry Store in the Pasadena Mall. Defendant, who had been employed there for approximately five weeks, and two other employees, Seike Mutsaers and Wanda Reynolds, were present at the time. After the store was open for business, at about 10:20 a.m., a Black man about five feet, nine inches, or five feet, ten inches tall and a somewhat thinner and taller man entered. One began talking with defendant. The other left and, upon returning a couple of minutes later, went to the back counter, pointed a gun at Mutsaers and said: " 'Don't move or I'll shoot.' " He then forced her to crawl to the vault, which he caused Reynolds to open. Reynolds was also compelled to open two black boxes, which contained the more expensive jewelry, in the vault. She was not asked to open another, similar black box which contained no valuable items. The man then caused Reynolds to join Mutsaers on the vault floor. He had tied the women's hands together with two separate plastic strips. Defendant was eventually forced to lie down in the vault as well. All the expensive pieces of jewelry in the display cases and elsewhere were taken. After the two men left, Mutsaers and Reynolds were able to free themselves; they instructed defendant to "hit the alarm" button.

Around 10:45 a.m., Officer Judy Jenkins arrived. Defendant told her that one man had held a gun on him and that he had been tied up with his necktie. Mutsaers, however, testified that she did not see that man holding a gun. Defendant told Officer Ronald Davis, who arrived about 11:35 a.m., that he had been, instead, tied with a plastic wire tie, the same as the ones used on the two women. Although a third plastic wire tie, which was not tied, had been found in the vault, Mutsaers and Reynolds both testified that neither had seen defendant's hands tied.

During that date defendant voluntarily stated to the general manager and the assistant manager of the store that he had been a victim of a prior robbery at a Santa Monica jewelry store.

Pasadena police investigator J. D'Angelo testified that the subject robbery was not typical. Specifically, he thought that the two men must have known the store cameras were dummies since it was unusual for two robbers to remain unmasked before store cameras almost 10 minutes. Also, there was almost no evidence of "casing". Even if the store had been

"cased", the men would not become aware of the two boxes in the vault, about which they had specifically asked. He therefore opined that the robbery was an inside job. Based on his investigation D'Angelo further opined that defendant was the robbery inside man.[2] He first spoke with defendant, either the day of the robbery or the following morning, for about 30 seconds. He again spoke with defendant on October 26 for about an hour to an hour and a half. Defendant was arrested after the second conversation on October 26. He was released on bail.

D'Angelo initially offered defendant immunity if he cooperated by identifying the two men and returning the items, defendant denied he was involved.

On October 27 defendant unsuccessfully attempted to contact D'Angelo at the police station by phone through a Reverend Reese. Sergeant Vandergrift informed D'Angelo that defendant had called to confess. When D'Angelo returned the call, he reached Reverend Reese's church.

Later that date, when D'Angelo finally contacted defendant, the latter stated: " 'I am ready to cooperate with you now. I have some of the merchandise and access to the rest of it.' " Defendant refused to divulge the names of the two men out of fear for his family.

In a subsequent conversation with defendant at defense counsel's office defendant was again offered immunity. This time defendant essentially stated that he knew nothing about the two men or the whereabouts of the jewelry.

Jeremy Staples, an informant, shared the tank in the Pasadena City jail with defendant. Staples was released on October 26 at 10:05 p.m. while defendant was released at 4:45 a.m. on October 27. He testified that, as a minor, he had been convicted of selling dangerous drugs (heroin) and sent to the Youth Authority but had not been sentenced to prison as an adult. He had been 19 or 20 at that time and was 36 at the time of trial. He also testified that he understood that in return for truthful testimony his present charge of possession of cocaine would be dropped.

Staples testified that while they were in jail together defendant had said: " 'This time they got me. This time they got me.' " Defendant also stated that he had been responsible for a lot of crimes in the past and that he was responsible for the subject robbery, which involved a half-a-million dollars.

---

[2] The two active perpetrators of the robbery were never apprehended, and none of the jewelry had been recovered at the time of the trial.

Defendant then asked Staples to inform defendant's sister, Carla, to remove from his apartment several pieces of jewelry, which came from the Gordon's Jewelry Store robbery, along with cocaine, because he was apprehensive that there would be a search. He also asked Staples to tell Carla to alert Wayne, and said that he had given several pieces of the jewelry to his mother. Staples related that information to Carla by telephone at about 1:30 a.m. It was stipulated that Staples had called her residence.

Defendant testified in his own behalf and denied participating in the robbery or having any prior knowledge of the robbery or the two men's names. He also denied stating that he had been tied with a necktie. He further denied telling Staples to deliver a message to get rid of jewelry and cocaine or discussing with him his involvement in the robbery. He disclaimed giving any jewelry to his sister or mother.

Defendant also testified that he told Reverend Reese that he was not involved and denied ever telling him anything that would indicate he had participated in the robbery. He did not recall whether Reese used the words "Michael wanted to confess" in his call to the police. However, he acknowledged that the word "confess" was on the tape recording of that call.

In his testimony defendant conceded that he had told D'Angelo that he had some of the merchandise and access to the rest. He explained that he made that statement only because D'Angelo repeatedly insisted that this was so, and had harassed his mother, and he made the statement to "get him off our backs and leave us alone for a little while so we can think."

On cross-examination defendant denied mentioning the name Wayne to Staples and represented that he did not know a "Wayne". The People then offered in evidence a piece of paper with writing on it found in defendant's vehicle. Over defendant's objection the court admitted it into evidence for the purpose of impeachment. It read: "Get face down on floor. Hands behind back. Cuff old lady. Make her stay face down. Pick man up. Make open both black boxes. Get him on floor. Cuff and tie then go to work. Wayne stand to my left after man is secure."

Defendant acknowledged that he had written everything on that piece of paper and asserted that he wrote it "after the robbery, the same day." He stated that he did not know who Wayne was, that it "was something that was heard." He admitted not giving the note to the police officers with whom he had spoken but testified that the purpose of the note was to help the police. Defendant testified that he and his mother and sister were harassed by the police but that neither he nor his mother or sister had filed a complaint for harassment with the police.

Reverend Reese testified that he was in error if he said that defendant wanted to "confess". Instead, he meant "cooperate" and tell his story.

Defendant's mother, Jestine Moore, testified that D'Angelo had used profanity in speaking to her and had harassed her. Although she did not complain to the police, she did attempt to make a complaint with the district attorney's office concerning D'Angelo's behavior. She had never known defendant to use cocaine and defendant had always told her that he was a victim of the robbery.

Carla Moore, defendant's sister, testified that on October 26 or 27, around 2 a.m., she received a call from someone who asked if she were defendant's sister Carla and then said: " 'Michael wants you guys to bail him out, get him out of there.' " He repeated this message several times. The caller never said that defendant wanted her to get rid of jewels or cocaine in the house. She never knew defendant to be involved in cocaine.

In rebuttal Lieutenant Whitaker testified that when defendant was confronted with the note, he denied ever seeing it before. D'Angelo testified that Staples brought up the name of Wayne himself, which name he had learned from defendant during their jail stay together. He denied ever using foul language or harassing defendant's mother.

DISCUSSION

On appeal, defendant makes two assignments of prejudicial error: 1. The court erred in permitting defendant to be impeached on cross-examination by the note which had been suppressed as having been obtained by illegal search and seizure; and

2. The court erred by failing to instruct the jury, sua sponte, that testimony of the defendant's oral admissions must be viewed with caution.

I. *Admission of Suppressed Evidence To Impeach Defendant*

■ First, defendant asserts that the court erred in admitting the previously suppressed note into evidence. As authority, he relies primarily on *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] and *People* v. *Clark* (1985) 171 Cal.App.3d 889 [217 Cal.Rptr. 819].

His reliance on those cases is misplaced. Both *Disbrow* and *Clark* involved the use for impeachment of inculpatory statements which were obtained from a defendant in violation of the standards set forth in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d

974] based upon the privilege against self-incrimination under the Fifth Amendment of the Constitution of the United States (federal Constitution) and article I, section 15 of the California Constitution. (*People v. Disbrow, supra,* 16 Cal.3d at pp. 105-113; *People v. Clark, supra,* 171 Cal.App.3d at pp. 892-894.) Those are not the facts in this case. ■ ■ ■ ■ ■ Moreover, the holdings in *Disbrow* and *Clark* that such statements may not be used to impeach a defendant are not correct statements of law.[3]

In the present case the note in question, which defendant admitted writing, was the subject of a motion to suppress evidence (§ 1538.5) on the ground it was the product of an unlawful search and seizure in violation of the Fourth Amendment of the federal Constitution and article I, section 13 (formerly § 19) of the California Constitution. The portion of that note setting forth the name "Wayne" was in direct conflict with defendant's testimony that he did not know of anyone with the name of "Wayne". (*People v. Atchley* (1959) 53 Cal.2d 160, 170 [346 P.2d 764].)

The People urge that the note was admissible under the standard set forth in *People v. Taylor* (1972) 8 Cal.3d 174, 179-183 [104 Cal.Rptr. 350, 501 P.2d 918], in that it was admissible on cross-examination to impeach defendant's "sweeping denials on direct examination" that he did not know the robbers, their names, and that he did not say anything to Staples concerning the robbery other than to ask him to call his family to bail him out.

We observe, however, that the *Taylor* case did not involve the admission of evidence that had been suppressed previously pursuant to a motion. (*People v. Belleci* (1979) 24 Cal.3d 879, 887-888 [157 Cal.Rptr. 503, 598 P.2d 473]; but see *People v. Flores* (1982) 128 Cal.App.3d 512, 521-523 [180 Cal.Rptr. 368], wherein the court held that volunteered disclaimer on direct

---

[3] As pointed out by our Supreme Court, the motion-to-suppress provisions of section 1538.5 are not applicable to involuntary extrajudicial statements obtained in violation of the privilege against self-incrimination unless such statements are the product of an illegal search and seizure. (*People v. DeVaughn* (1977) 18 Cal.3d 889, 896-897 at fn. 6, 898 [135 Cal.Rptr. 786, 558 P.2d 872]; see *People v. Superior Court (Scott)* (1980) 112 Cal.App.3d 602, 605 [169 Cal.Rptr. 412].)

In *People v. May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307] our Supreme Court held that section 28, subdivision (d), of article I of the California Constitution abrogated the rule in *People v. Disbrow, supra,* 16 Cal.3d 101 at p. 113, that the privilege against self-incrimination of article I, section 15, of the California Constitution precludes the use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny. (*People v. May, supra,* 44 Cal.3d 309, 311, 315.) Statements obtained in violation of article I, section 15 are therefore admissible for impeachment purposes. (*People v. May, supra,* 44 Cal.3d at pp. 315-319, citing *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643].)

of never having sold heroin " 'opened the door' " to the use on cross-examination of evidence of a prior heroin sale which had been the subject of a prosecution that had been dismissed following a successful suppression motion.)

In *Belleci* our Supreme Court held that if evidence is suppressed pursuant to a final order under section 1538.5, then such evidence is inadmissible at any trial or hearing. (*People* v. *Belleci, supra,* 24 Cal.3d 879, 887-888.) Pursuant to the holding in *Belleci* admission of the note to impeach defendant would be improper.

■    However, in 1982, Proposition 8, which added section 28, subdivision (d) (section 28(d)), to article I of the California Constitution, was adopted. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 254 [193 Cal.Rptr. 692, 667 P.2d 149].) In *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744] our Supreme Court expressly held that "Proposition 8 has abrogated . . . a defendant's right to object to and suppress evidence seized in violation of the California, but not the federal, Constitution." (*Id.* at p. 879.) In other words, the effect of section 28(d) is to permit admission of unlawfully seized evidence unless exclusion is mandated by the Fourth Amendment exclusionary rule of the federal Constitution. (*In re Lance W., supra,* 37 Cal.3d at pp. 884-890, 896; see also *People* v. *Brewster* (1986) 184 Cal.App.3d 921, 929 [229 Cal.Rptr. 352].)

It is clear that under the federal Constitution admission of the note was proper.    ■■    "[A] defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." (*United States* v. *Havens* (1980) 446 U.S. 620, 627-628 [64 L.Ed.2d 559, 566, 100 S.Ct. 1912]; cf. *People* v. *Flores, supra,* 128 Cal.App.3d 512 at pp. 521-523, wherein the court upheld the admission of previously suppressed evidence under the standard set forth in *Taylor* without any mention of § 28(d) or reference to the exclusionary rule under the federal Constitution.)

Based on the foregoing we conclude that *Belleci,* a pre-Proposition 8 case, must be construed in light of section 28(d). In so doing it is manifestly clear that *Belleci's* unqualified holding that evidence suppressed pursuant to section 1538.5 is inadmissible at any trial or hearing must be modified to include the qualification: if exclusion is mandated by the Fourth Amendment exclusionary rule of the federal Constitution.    ■■    Applying the qualified holding of *Belleci* to this case we find the trial court correctly admitted the note to impeach defendant since exclusion was not mandated

under the federal Constitution (*United States* v. *Havens, supra,* 446 U.S. 620, 627-628 [64 L.Ed.2d 559, 566].)

█   Defendant's remaining claim in this regard concerns the trial court's failure sua sponte to instruct the jury that admission of the note was limited to impeachment purposes. We find no error. It is established that in the absence of a request for a limiting instruction the trial court has no duty to give such an instruction. (See, e.g., *People* v. *Simms* (1970) 10 Cal.App.3d 299, 311 [89 Cal.Rptr. 1]; *People* v. *Clark* (1987) 193 Cal.App.3d 178, 182-183 [238 Cal.Rptr. 230].)

II.   *Failure to Instruct that Evidence of Oral Admissions Must Be Viewed with Caution*

█   Defendant contends that the court was required, sua sponte, to instruct the jury that evidence of the defendant's oral admissions must be viewed with caution. Defendant points out that the court received evidence concerning his oral admissions to Staples that " 'This time, they got me. This time they got me' " that defendant was responsible for the robbery, and that he had given his mother several pieces of the jewelry; and his oral admission to D'Angelo that " 'I'm ready to cooperate with you now. I have some of the merchandise and access to the rest of it.' " Defendant acknowledges that this omission does not constitute reversible error per se; however, he urges that reversal is mandated in this case because, in the absence of that error, a result more favorable to him appears to be reasonably probable. (*People* v. *Lopez* (1975) 47 Cal.App.3d 8, 13 [120 Cal.Rptr. 562].)

We have no quarrel with defendant's recitation of law. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 455-456 [99 Cal.Rptr. 313, 492 P.2d 1].) Nonetheless, we disagree with his conclusion. In view of the overwhelming evidence of defendant's guilt, it is not reasonably probable that a result more favorable to him would occur in the absence of the error. (Cal. Const., art. VI, § 13; § 1258; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Beagle, supra,* 6 Cal.3d at pp. 455-456.)

The jury had ample opportunity to weigh the evidence and judge credibility. Staples was not portrayed as a disinterested witness. Rather, the jury knew he was a felon and given immunity for his testimony. Moreover, his testimony was corroborated by the contents of the written note, which defendant admitted writing, from which it could be inferred that "Wayne" was the name of one robber, which note was not the source of Staples' knowledge of the name. Defendant also admitted having made the statement to D'Angelo about wanting to cooperate, and possessing some of the jewelry, and knowledge about the remainder. Moreover, the court did in-

struct the jury, pursuant to CALJIC No. 2.72, that the corpus delicti must be proved independent of any admission made by defendant outside of trial. (Cf. *People* v. *Beagle, supra,* 6 Cal.3d at p. 455.)  ▮  It must be presumed that the jury followed that admonition. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1120 [240 Cal.Rptr. 585, 742 P.2d 1306].)  ▮  Accordingly, omission of the cautioning instruction was harmless error. (*People* v. *Beagle, supra,* 6 Cal.3d at p. 455.)

### DECISION

The judgment is affirmed.

Klein, P. J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 25, 1988. Mosk, J., was of the opinion that the petition should be granted.